**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

|  |  |
|---|---|
| WILLIAM J. MARTIN, individually and on behalf of all others similarly situated, | |
| Plaintiff, | |
| v. | Civil Action No. 1:22-cv-04776-DLC |
| MEREDITH CORPORATION, MEREDITH HOLDINGS CORPORATION, IAC/INTERACTIVECORP, DOTDASH MEDIA, INC., and DOTDASH MEREDITH, INC., | **ORAL ARGUMENT REQUESTED** |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT**
**OF DEFENDANTS' MOTION TO DISMISS**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 3

    A.    Defendants and People ............................................................................ 3

    B.    Alleged Statutory Violations .................................................................. 4

LEGAL STANDARDS ....................................................................................... 7

ARGUMENT ...................................................................................................... 9

I.      PLAINTIFF LACKS ARTICLE III STANDING ............................................. 9

II.     PLAINTIFF FAILS TO ALLEGE A VIOLATION OF THE VPPA ............................ 13

    A.    The VPPA ............................................................................................. 13

    B.    Plaintiff Fails to Allege a Knowing Disclosure of PII ........................ 14

          1.    The Information at Issue Is Not PII Because It Does Not Identify "Specific Video Materials or Services" .................................. 15

          2.    The Information at Issue Is Not PII Because It Does Not "Identif[y] a Person" ........................................................... 19

          3.    Plaintiff Fails to Allege That People.com Knowingly Transmitted PII ................................................................... 22

    C.    People.com Is Not a Video Tape Service Provider ............................... 24

          1.    People.com Is Not Engaged in the Business of Renting, Selling, or Delivering Prerecorded Video Cassette Tapes or Similar Audio Visual Materials ....................................... 24

          2.    Minutes-Long Entertainment and Montage Clips Are Not "Prerecorded Video Cassette Tapes" or "Similar Audio Visual Materials" .................................................................... 26

III.    COUNTS 2–5 DO NOT MEET RULE 8(A)'S NOTICE PLEADING STANDARD .................................................................................................... 28

IV.    PLAINTIFF FAILS TO PLEAD A VIOLATION OF SECTION 1799.3 ..................... 29

V.     PLAINTIFF FAILS TO PLEAD AN OPPA VIOLATION ........................................... 31

**TABLE OF CONTENTS**
(continued)

**Page**

VI.     PLAINTIFF FAILS TO PLEAD A UCL CLAIM ............................................................ 32

VII.    PLAINTIFF FAILS TO PLEAD A CLAIM UNDER N.Y. GENERAL
        BUSINESS LAW............................................................................................................ 33

CONCLUSION.......................................................................................................................... 35

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Amazon.com LLC v. Lay*,
  758 F. Supp. 2d 1154 (W.D. Wash. 2010) ................................................................15

*APWU v. Potter*,
  343 F.3d 619 (2d Cir. 2003) ........................................................................................8

*Arista Records, LLC v. Doe 3*,
  604 F.3d 110 (2d Cir. 2010) ......................................................................................23

*Atl. Recording Corp. v. Project Playlist, Inc.*,
  603 F. Supp. 2d 690 (S.D.N.Y. 2009) .........................................................................9

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007) ..........................................................................................8

*Austin-Spearman v. AMC Network Entm't LLC*,
  98 F. Supp. 3d 662 (S.D.N.Y. 2015) ...........................................................9, 11, 12

*Barrett v. Apple Inc.*,
  523 F. Supp. 3d 1132 (N.D. Cal. 2021) ....................................................................33

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ...............................................................................................8, 29

*Bernardino v. Barnes & Noble Booksellers, Inc.*,
  No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230 (S.D.N.Y. Aug. 11,
  2017) ...........................................................................................................19, 20, 23

*BHRS Grp., LLC v. Brio Water Tech., Inc.*,
  553 F. Supp. 3d 793 (C.D. Cal. 2021) ......................................................................33

*Boelter v. Hearst Commc'ns, Inc.*,
  269 F. Supp. 3d 172 (S.D.N.Y. 2017) .........................................................................8

*Broidy Cap. Mgmt. LLC v. Benomar*,
  944 F.3d 436 (2d Cir. 2019) ........................................................................................8

*Capitol Records, LLC v. Vimeo, LLC*,
  826 F.3d 78 (2d Cir. 2016) ........................................................................................20

*Cappello v. Walmart Inc.*,
  No. 18-cv-06678-RS, 2019 WL 11687705 (N.D. Cal. Apr. 5, 2019) .................32, 33

**TABLE OF AUTHORITIES**

(continued)

Page(s)

*Carter v. HealthPort Techs., LLC,*
    822 F.3d 47 (2d Cir. 2016)....................................................................7, 12

*In re Certified Question from the U.S. Ct. of Appeals for the 9th Cir. (Deacon v. Pandora Media, Inc.),* 885 N.W.2d 628 (Mich. 2016) ...........................................30

*Cherny v. Emigrant Bank,*
    604 F. Supp. 2d 605 (S.D.N.Y. 2009)......................................................34

*Cheung v. Bristol-Myers Squibb Co.,*
    282 F. Supp. 3d 638 (S.D.N.Y. 2017)......................................................24

*Cohen v. Casper Sleep Inc.,*
    No. 17 Civ. 9325 (WHP), 2018 WL 3392877 (S.D.N.Y. Jul. 12, 2018)...............................34

*Derbaremdiker v. Applebee's Int'l, Inc.,*
    No. 12-CV-01058 (KAM), 2012 WL 4482057 (E.D.N.Y. Sept. 26, 2012),
    *aff'd,* 519 F. App'x 77 (2d Cir. 2013)....................................................8, 9

*Dish Network Corp. v. Ace Am. Ins. Co.,*
    431 F. Supp. 3d 415 (S.D.N.Y. 2019), *aff'd,* 21 F.4th 207 (2d Cir. 2021)...........................25

*Doron Precision Sys., Inc. v. FAAC, Inc.,*
    423 F. Supp. 2d 173 (S.D.N.Y. 2006).....................................................16

*Eichenberger v. ESPN, Inc.,*
    876 F.3d 979 (9th Cir. 2017) ........................................................ *passim*

*Eichenberger v. ESPN, Inc.,*
    No. C14-463-TSZ, 2015 WL 7252985 (W.D. Wash. May 7, 2015) ......................................20

*Ellis v. Cartoon Network, Inc.,*
    No. 1:14-CV-484-TWT, 2014 WL 5023535 (N.D. Ga. Oct. 8, 2014) ...................................20

*FTC v. Amazon.com, Inc.,*
    No. C14-1038-JCC, 2015 WL 11256312 (W.D. Wash. Aug. 3, 2015)...............................15, 16

*Gonzalez v. Cent. Elec. Coop. Inc.,*
    Civ. Nos. 08–6236–HO, 08–6240–HO, 2009 WL 3415235 (D. Or. Oct. 15, 2009) ..........................................................................15

*In re Google Inc. St. View Elec. Commc'ns Litig.,*
    794 F. Supp. 2d 1067 (N.D. Cal. 2011) ..................................................32

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Grand River Enters. Six Nations, Ltd. v. Boughton,*
    988 F.3d 114 (2d Cir. 2021) ................................................................................7

*People ex rel. Harris v. Delta Air Lines, Inc.,*
    247 Cal. App. 4th 884 (2016) ...........................................................................31

*Holmes v. Air Line Pilots Ass'n, Int'l,*
    745 F. Supp. 2d 176 (E.D.N.Y. 2010) ...............................................................5

*In re Hulu Priv. Litig.,*
    86 F. Supp. 3d 1090 (N.D. Cal. 2015) ........................................................ *passim*

*In re Hulu Priv. Litig.,*
    No. C 11-03764 LB, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) ....................28

*In re Hulu Priv. Litig.,*
    No. C 11-03764-LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014)................20, 21

*Infanti v. Scharpf,*
    No. 06 CV 6552 (ILG), 2008 WL 2397607 (E.D.N.Y. Jun. 10, 2008) .................29

*Ingels v. Westwood One Broad. Servs., Inc.,*
    129 Cal. App. 4th 1050 (2005) .........................................................................33

*In re iPhone Application Litig.,*
    No. 11-MD-02250-LHK, 2011 WL 4403963 (N.D. Cal. Sept. 20, 2011).............32

*Katz v. Donna Karan Co.,*
    872 F.3d 114 (2d Cir. 2017).........................................................................7, 12

*Kaufman v. SiriusXM Radio, Inc.,*
    751 F. Supp. 2d 681 (S.D.N.Y. 2010).............................................................34

*Kwikset Corp. v. Super. Ct.,*
    51 Cal. 4th 310 (2011) ................................................................................32, 33

*Lamda Sols. Corp. v. HSBC Bank USA, N.A.,*
    574 F. Supp. 3d 205 (S.D.N.Y. 2021)................................................................8

*Liberian Cmty. Ass'n of Conn. v. Lamont,*
    970 F.3d 174 (2d Cir. 2020)..............................................................................7

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)..............................................................................7, 11, 12

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*McMorris v. Carlos Lopez & Assocs., LLC,*
   995 F.3d 295 (2d Cir. 2021)......................................................................................11

*Moghadam v. Regents of Univ. of Cal.,*
   169 Cal. App. 4th 466 (2008) ...................................................................................31

*Mollett v. Netflix, Inc.,*
   795 F.3d 1062 (9th Cir. 2015) ..................................................................................29

*Mollett v. Netflix, Inc.,*
   No. 12-17045, 2012 WL 3731542 (N.D. Cal. Aug. 17, 2012) ..................................31

*Mount v. PulsePoint, Inc.,*
   684 F. App'x 32 (2d Cir. 2017)*, as amended* (May 3, 2017) ...................................35

*In re Nickelodeon Consumer Priv. Litig.,*
   827 F.3d 262 (3d Cir. 2016)..........................................................................15, 19, 21

*In re Nickelodeon Consumer Priv. Litig.,*
   No. 2443 (SRC), 2014 WL 3012873 (D.N.J. Jul. 2, 2014)...................20, 24, 26, 28

*In re Parmalat Secs. Litig.,*
   375 F. Supp. 2d 278 (S.D.N.Y. 2005).........................................................................8

*People v. King,*
   38 Cal. 4th 617 (2006) ..............................................................................................30

*Perry v. CNN, Inc.,*
   No. 1:14-CV-02926-ELR, 2016 WL 4373708 (N.D. Ga. Apr. 20, 2016)..............20

*Perry v. NYSARC, Inc.,*
   424 F. App'x 23 (2d Cir. 2011) ...................................................................................8

*PK Music Performance, Inc. v. Timberlake,*
   No. 16-CV-1215 (VSB), 2018 WL 4759737 (S.D.N.Y. Sept. 30, 2018) .................16

*Robinson v. Disney Online,*
   152 F. Supp. 3d 176 (S.D.N.Y. 2015)...................................................................20, 21

*Robinson v. Gov't of Malaysia,*
   269 F.3d 133 (2d Cir. 2001).........................................................................................7

*Rothman v. Gregor,*
   220 F.3d 81 (2d Cir. 2000)......................................................................................5, 8

# TABLE OF AUTHORITIES
(continued)

**Page(s)**

*Ruiz v. Gap, Inc.*,
    540 F. Supp. 2d 1121 (N.D. Cal. 2008), *aff'd*, 380 F. App'x 689 (9th Cir.
    2010) ....................................................................................................................32, 33

*Santana v. Take-Two Interactive Software, Inc.*,
    717 F. App'x 12 (2d Cir. 2017) ........................................................................12, 13

*Shostack v. Diller*,
    No. 15 Civ. 2255 (GBD), 2016 WL 958687 (S.D.N.Y. Mar. 8, 2016) ...................34

*SimplexGrinnell LLP v. Integrated Sys. & Power, Inc.*,
    642 F. Supp. 2d 167 (S.D.N.Y. 2009)....................................................................35

*Sira v. Morton*,
    380 F.3d 57 (2d Cir. 2004)......................................................................................8

*Smith v. Chase Manhattan Bank, USA, N.A.*,
    293 A.D.2d 598 (N.Y. App. Div. 2002) ..................................................................34

*Sonner v. Premier Nutrition Corp.*,
    971 F.3d 834 (9th Cir. 2020) .................................................................................33

*Spokeo, Inc. v. Robins*,
    578 U.S. 330 (2016).............................................................................................12

*Sterk v. Redbox Automated Retail, LLC*,
    770 F.3d 618 (7th Cir. 2014) .................................................................................10

*Svenson v. Google Inc.*,
    65 F. Supp. 3d 717 (N.D. Cal. 2014) .....................................................................32

*Thorn v. Formula 1 Motorsports, Inc.*,
    No. 19-CV-1077 (JPO), 2019 WL 6916098 (S.D.N.Y. Dec. 19, 2019)....................9

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021).....................................................................................10, 12

*Tyler v. Douglas*,
    280 F.3d 116 (2d Cir. 2001)...................................................................................24

*United States v. Rowland*,
    826 F.3d 100 (2d Cir. 2016)...................................................................................25

*United States v. Shultz*,
    No. 16-10107-01 (EFM), 2018 WL 534333 (D. Kan. Jan. 24, 2018) .....................15

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

*United States v. Stanko*,
    491 F.3d 408 (8th Cir. 2007) ....................................................................27

*Van Patten v. Vertical Fitness Grp., LLC*,
    847 F.3d 1037 (9th Cir. 2017) ..................................................................32

*In re Vizio, Inc. Consumer Priv. Litig.*,
    238 F. Supp. 3d 1204 (C.D. Cal. 2017) ....................................24, 25, 26

*W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*,
    549 F.3d 100 (2d Cir. 2008)......................................................................13

*Watkins v. Smith*,
    No. 12 Civ. 4635 (DLC), 2013 WL 655085 (S.D.N.Y. Feb. 22, 2013) ...................................29

*Wilson v. Triller, Inc.*,
    No. 21-cv-11228 (JSR), 2022 WL 1138073 (S.D.N.Y. Apr. 18, 2022) .................8, 20, 21, 23

*Wojchowski v. Daines*,
    498 F.3d 99 (2d Cir. 2007)........................................................................27

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
    No. 16-MD-02752-LHK, 2017 WL 3727318 (N.D. Cal. Aug. 30, 2017).............................31

*Yershov v. Gannett Satellite Info. Network, Inc.*,
    820 F.3d 482 (1st Cir. 2016).....................................................................20

**Rules and Statutes**

Federal Rules of Civil Procedure
    Rule 8 ......................................................................................................29
    Rule 8(a)...........................................................................................2, 28, 29
    Rule 11 ....................................................................................................29
    Rule 12(b)(1)...........................................................................................1, 7
    Rule 12(b)(6).....................................................................................1, 8, 33

18 U.S.C.
    § 2710(a)(3) ................................................................................13, 14, 15
    § 2710(a)(4) .......................................................................13, 14, 24, 26
    § 2710(b)(1) ..............................................................................13, 21, 23

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

Cal. Bus. & Prof. Code
    § 17200..............................................................................................................4, 33
    § 22575..............................................................................................................4, 31
    § 22575(a) ...............................................................................................................32
    § 22576....................................................................................................................32

Cal. Civ. Code
    § 1799.3............................................................................................................ *passim*
    § 1799.3(a) ..............................................................................................................30
    § 1799.3(c) ..............................................................................................................30

New York General Business Law § 349........................................................... *passim*

Video Privacy Protection Act Amendments Act of 2012, Pub. L. No. 112-258,
    126 Stat. 2414 (2013)............................................................................................14

**Other Authorities**

Andrea Peterson, *How Washington's Last Remaining Video Store Changed the
    Course of Privacy Law*, Washington Post (Apr. 28, 2014) ...................................13

Glenn Garner, *Kim Kardashian 'Couldn't Be More Thrilled' After Passing Baby
    Bar Exam: Source* (Dec. 13, 2021), https://people.com/tv/kim-kardashian-
    couldnt-be-more-thrilled-after-passing-baby-bar-exam-source................................4

*Jimmy Confronts Blake Shelton About Not Getting a Wedding Invite | The Tonight
    Show* (Dec. 2, 2021), https://www.youtube.com/ watch?v=7VoOGWuYwJA .......................4

Katie Campione, *Ryan Reynolds Hilariously Trolls Wife Blake Lively on Her
    Birthday* (Aug. 26, 2021), https://people.com/movies/ryan-reynolds-
    hilariously-trolls-wife-blake-lively-on-her-birthday......................................11, 17

Natasha Dado, *Jimmy Fallon Teases Blake Shelton About Not Making the Guest
    List for Wedding to Gwen Stefani* (Dec. 3, 2021), https://people.com/country
    /jimmy-fallon-blake-shelton-guest-list-wedding-gwen-stefani/ ................................4

S. Rep. No. 100-599 (1988)...............................................................................14, 27

Simon Perry and Michele Tauber, *Queen Elizabeth, the Longest-Reigning British
    Monarch, Dies at 96* (Sept. 8, 2022), https://people.com/royals/queen-
    elizabeth-dead-british-monarch-age-96/.................................................................16

Taylor J. Stephan, *Jennifer Garner Sported a New Style from Her Go-To Comfy
    Sneaker Brand — Get Her Exact Pair at Amazon* (Aug. 7, 2022),
    https://people.com/style/jennifer-garner-new-brooks-running-shoes....................16

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*,
    Hearing on H.R. 2471 Before the Subcomm. on Privacy, Technology, and the
    Law, 112th Cong. (2nd Sess. Jan. 31, 2012) (Statement of William
    McGeveran) .................................................................................................................14

Webster's Third New International Dictionary 302 (1981) (def. 1d)............................................25

## INTRODUCTION

People.com is a free online news source, owned by Dotdash Meredith, Inc. ("Dotdash Meredith"), that users can visit to read articles about celebrities and other topics. Plaintiff William J. Martin principally claims that Dotdash Meredith has violated the Video Privacy Protection Act, 18 U.S.C. § 2710 ("VPPA"), by allegedly disclosing users' personally identifiable information ("PII") without their consent through People.com. Specifically, Plaintiff alleges that when he views video clips on People.com, Facebook receives his Facebook ID, the address of the webpage on which the video is being watched, and the title of the video. Plaintiff also asserts claims against Dotdash Meredith's parent company, its predecessor company, and two intermediate entities from the recent merger that formed Dotdash Meredith. The additional claims against all Defendants are brought under: Cal. Civ. Code § 1799.3 ("§ 1799.3"), California's analogue to the VPPA; California's Online Privacy Protection Act ("OPPA"); California's Unfair Competition Law ("UCL"); and New York General Business Law ("GBL") § 349.

The Complaint ("Complaint") suffers from several fatal defects. At the threshold, Plaintiff lacks Article III standing because the only asserted (and possible) injury in fact is an invasion of privacy in Plaintiff's video-watching history. Facially, the Complaint's allegations and an incorporated document—*Meta Pixel*—flatly contradict any such injury. Factually, Plaintiff lacks standing because, as established by the Declaration of Junsu Choi, People.com does not transmit data to Facebook that reveals a user watched or requested any specific video. The Court should therefore dismiss the Complaint pursuant to Rule 12(b)(1).

In addition to this jurisdictional defect, each of the Complaint's five claims should be dismissed under Rule 12(b)(6) for the following reasons:

For Count 1, there is no plausible VPPA violation because: (a) the allegedly disclosed information—a Facebook-created cookie and the Uniform Resource Locator ("URL") for *articles*

on People.com—is not PII because it identifies neither a person nor any specific videos he requested or obtained, respectively; (b) Plaintiff fails to sufficiently allege that any such disclosure was knowing; (c) People.com is not a video tape service provider as defined by the VPPA; and (d) short video clips that accompany written articles are not "prerecorded video cassette tapes" or "similar audio visual materials" within the purview of the statute.

Counts 2 through 5 require dismissal because they do not meet Rule 8(a)'s basic notice pleading standard. Each of these claims is broadly asserted against "Defendants" for their operation of unspecified websites. Plaintiff does not explain each Defendant's role in the alleged conduct, nor does he identify the website(s) that form the basis of these claims. Due to these core pleading deficiencies, the Complaint does not give fair notice of the claims, and the Court should dismiss on this ground alone.

Count 2—which alleges a violation of § 1799.3, a California state statute modeled on the VPPA—fails for many of the same reasons the VPPA claim does. In addition, § 1799.3 only applies to an entity that provides "video recording sales or rental services." People.com—the only website Plaintiff allegedly used—is a free website that neither sells nor rents video recordings.

Count 3 alleges a violation of the OPPA, a California statute that requires a website operator to post a privacy policy containing certain information. This claim fails because the OPPA does not provide a private right of action.

Count 4—the UCL claim—is fatally deficient because Plaintiff does not allege he lost money or property as the result of any unlawful, unfair, or deceptive business practice, and he therefore lacks statutory standing to sue.

Finally, Count 5—the GBL claim—fails because Plaintiff does not allege a cognizable injury.

For all of these reasons, detailed further below, the Court should dismiss the Complaint in its entirety, with prejudice.

## BACKGROUND

### A.      Defendants and People

People is an award-winning news source that "delivers the most trustworthy celebrity news and captivating human interest stories[.]" Complaint, ECF No. 1 ("Compl."), ¶ 54 (describing People.com as a "news and media" site).[1] People is owned by Dotdash Meredith, a Delaware corporation with its principal place of business in New York. *Id.* ¶¶ 18, 21. Dotdash Meredith is in turn owned by IAC Inc., f/k/a IAC/InterActiveCorp ("IAC"), a publicly traded Delaware corporation based in New York. *Id.* ¶ 20.[2] People delivers celebrity news and human-interest stories in many ways, including through *People*, a weekly magazine launched in 1974, podcasts, and its website, https://people.com. *Id.* ¶ 60; *see also* n.1 *supra*.

This lawsuit concerns People.com, a free website that contains articles about celebrities, politics, crime, human interest, and lifestyle. Compl. ¶¶ 1–3, 139; *see also* https://people.com (menu in top left corner). Some of these articles contain short, embedded video clips that the reader may play. Compl. ¶¶ 55–56. Plaintiff contends that these video clips "will 'auto-play' when the user lands on the page." *Id.* ¶ 119.

The Complaint includes two screenshots of video clips purportedly found on People.com,

---

[1] *See also About People*, Dotdash Meredith, https://people.com/about-us-5499056.

[2] From February 1, 2018 to December 1, 2021, Meredith Corporation owned People. *See* ECF No. 35 ¶ 1. During that time, Meredith Corporation was incorporated and headquartered in Iowa. *Id.*; Compl. ¶ 20. In a series of transactions completed on December 1, 2021, all of Meredith Corporation's assets relating to People were transferred to Meredith Holdings Corporation ("Meredith Holdings"), and those assets were then acquired by Dotdash Media, Inc., a wholly owned subsidiary of IAC. ECF No. 35 ¶¶ 2–5. After these transactions, Meredith Corporation ceased to exist, and People's assets were held by Meredith Holdings, a wholly owned subsidiary of Dotdash Meredith, whose ultimate parent entity is IAC. *Id.* at ¶ 6.

although Plaintiff does not include the URL for either. *Id.* The first clip is embedded in an article titled "Jimmy Fallon Teases Blake Shelton About Not Making the Guest List for Wedding to Gwen Stefani." *Id.* ¶ 55.[3] As is clear from the "Watch on YouTube" footer at the bottom of the video, this is a YouTube clip from *The Tonight Show Starring Jimmy Fallon*, Compl. ¶ 55, and not content created by People.com. Further, the *Tonight Show* clip has a different title than the title of the underlying article. *Id.*[4] The second screenshot (also missing the URL), is from a People.com article titled "Kim Kardashian 'Couldn't Be More Thrilled' After Passing Baby Bar Exam: Source."[5] Compl. ¶ 56. The embedded video clip appears toward the end of the article, is 70 seconds long, and has a different title: "'Don't Ever Give Up' Kim Kardashian Passes Baby Bar Exam on 4th Try." *Id.* Plaintiff does not allege he watched either video. *Id.*

### B.   Alleged Statutory Violations

The Complaint, filed on June 7, 2022, brings claims under: (1) the VPPA, 18 U.S.C. § 2710 (against Dotdash Meredith only); (2) Cal. Civ. Code § 1799.3; (3) the OPPA, Cal. Bus. & Prof. Code § 22575; (4) the UCL, Cal. Bus. & Prof. Code § 17200; and (5) GBL §§ 349 *et seq*. Counts 2–5 are asserted against all Defendants. The claims center on information People.com allegedly sends to Facebook (now Meta, *see* n.7) via certain Facebook-created pixels and cookies.

The Complaint alleges that each time a "Registered User"—one who "joins" People.com by entering their name and email or links their Google or Facebook account to the site, Compl.

---

[3] *See* Natasha Dado, *Jimmy Fallon Teases Blake Shelton About Not Making the Guest List for Wedding to Gwen Stefani*, People.com (Dec. 3, 2021), https://people.com/country/jimmy-fallon-blake-shelton-guest-list-wedding-gwen-stefani/.

[4] Clicking the embedded video's title causes a new window to open on the YouTube platform: *Jimmy Confronts Blake Shelton About Not Getting a Wedding Invite | The Tonight Show*, YouTube.com (Dec. 3, 2021), https://www.youtube.com/watch?v=7VoOGWuYwJA.

[5] *See* Glenn Garner, *Kim Kardashian 'Couldn't Be More Thrilled' After Passing Baby Bar Exam: Source*, People.com (Dec. 13, 2021), https://people.com/tv/kim-kardashian-couldnt-be-more-thrilled-after-passing-baby-bar-exam-source.

¶ 66[6]—watches a video on People.com, Dotdash Meredith sends Facebook:

- the Registered User's Facebook ID, a "unique and persistent identifier" that "typically is a string of numbers," *id.* ¶ 88;

- the address of the webpage—*i.e.*, URL—on which the video is being watched, *id.* ¶¶ 82–83; and

- by extension, the URL of the video, which allegedly "reports the title of the video to . . . Facebook," *id.* ¶¶ 84, 102.

The only type of information that allegedly identifies a person is the numerical Facebook ID. *Id.* ¶¶ 87–90. As the Complaint makes clear, Facebook, not Dotdash Meredith, "installs 'cookies' on Facebook users' web browsers when they visit Facebook.com," and these Facebook-installed cookies associate the user's device with a Facebook ID. *Id.* ¶¶ 91–96.[7] The diagram at paragraph 95 of the Complaint shows that Facebook "*direct[s]* the [user's] browser to set a 'c_user' cookie with the user's public id," *i.e.*, the Facebook ID. *Id.* (emphasis added). There is no allegation that Dotdash Meredith has anything to do with this process (nor could it); the data transmission is between the user and Facebook. *Id.* ¶¶ 95–96.

As for information identifying the specific videos watched, Plaintiff alleges without support that "*viewing* a video on People.com . . . triggers the Facebook Pixel code embedded on those websites to report the title of the video and the viewer's Facebook ID to Facebook." *Id.* ¶ 102 (emphases added). However, the Complaint relies on and incorporates documents that

---

[6] In early August 2022, Dotdash Meredith removed login functionality from People.com, including the ability to login through Google or Facebook. Declaration of Junsu Choi ("Choi Decl.") at ¶ 3.

[7] Plaintiff does not cite the source for the Facebook-attributed quote at Complaint paragraph 93. The Court can take judicial notice that the quoted language appears in a Facebook Help Center article, *How does Facebook use cookies and how can I control my cookies on Facebook?*, https://www.facebook.com/help/336858938174917 ("Cookies are small pieces of text used to store information on web browsers. They're used to store and receive identifiers and other info on computers, phones, and other devices."). The Help Center article contains a hyperlink to Facebook's Cookies Policy, https://www.facebook.com/policies/cookies. *See Holmes v. Air Line Pilots Ass'n, Int'l*, 745 F. Supp. 2d 176, 193 (E.D.N.Y. 2010) (A document is deemed incorporated where it is "quoted in the complaint"); *see also Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) ("For purposes of a motion to dismiss, we have deemed a complaint to include . . . any statements or documents incorporated in it by reference, and documents the plaintiff either possessed or knew about and upon which they relied in bringing the suit.")

contradict the allegation that the title of a viewed video is reported to Facebook. Compl. ¶¶ 110–12, nn.37–38. For example, the Complaint alleges that: (a) Facebook's Base Pixel, "as a default, causes the Facebook Pixel to track the name of the *website being viewed* and sends the *name of the website* and the corresponding Facebook ID to Facebook;" and (b) "Dotdash Meredith has retained the default settings" for the Facebook Pixel on People.com "and has *not* created any specific events, such as 'add to cart' or 'checkout' for additional tracking." *Id.* ¶¶ 110–12, nn.37–38; 114–16 (emphases added). An examination of the incorporated *Meta Pixel* document[8] reveals that the "default settings" for the Facebook Pixel—or "standard events," in Meta's terms—only "tell[] you if someone visits a web page's URL, *but not what they see or do on that page.*"[9] This flatly contradicts the notion that Facebook receives any information from Dotdash Meredith about titles of video clips *viewed* by People.com visitors.

Plaintiff asserts he is a California resident who has watched video content on People.com daily since late 2020. *Id.* ¶ 13. Plaintiff has never paid money to access this content; People.com is a free website with no paywall. *Id.* Nevertheless, Plaintiff asserts he is an "active subscriber" who signed up to receive People's free emailed newsletter. *Id.* Plaintiff visits People.com by navigating directly to the site and by "indirectly" accessing it through his Facebook account. *Id.*

---

[8] *See Meta for Developers*, *Meta Pixel, Conversion Tracking*, Meta, https://developers.facebook.com/docs/facebook-pixel/implementation/conversion-tracking (last visited Sept. 16, 2022) ("Meta Pixel") (cited in Compl. ¶¶ 110, n.37; 112, n.38).  The Court can take judicial notice that on October 28, 2021, Facebook changed its company name to Meta, *see Founder's Letter*, *2021* (Oct. 28, 2021), https://about fb.com/news/2021/10/founders-letter, Meta, and on June 9, 2022, the company changed its stock ticker from "FB" to "META." *Meta Investor Relations: Meta Platforms, Inc. to Change Ticker Symbol to 'META' on June 9*, Meta (May 31, 2022), https://investor.fb.com/investor-news/press-release-details/2022/Meta-Platforms-Inc.-to-Change-Ticker-Symbol-to-META-on-June-9/default.aspx. The Court also can take judicial notice that the URL cited in the Complaint's footnotes 37–38 automatically redirects to: https://developers facebook.com/docs/meta-pixel. Ex. 1 to Declaration of Alexander J. Kasner ("Kasner Decl."). To track the Complaint's allegations, Defendants refer to Facebook, unless the title of the incorporated document says Meta.

[9] *See Meta for Developers, Meta Pixel Reference, Standard Events,* Meta, https://developers facebook.com/docs/meta-pixel/reference#standard-events (last visited Sept. 16, 2022) (emphasis added) (describing "ViewContent" standard event as: "[a] visit to a web page you care about (for example, a product page or landing page). ViewContent tells you if someone visits a web page's URL, but not what they see or do on that page"); Ex. 2 to Kasner Decl.

Each of Plaintiff's claims rests on the same alleged injury: invasion of privacy. *Id.* ¶¶ 122, 133. Plaintiff seeks to represent a nationwide class of "all registered users of People.com in the United States with a Facebook account who viewed a video on the People.com website," and a similarly defined California subclass. *Id.* ¶¶ 139–41. He demands statutory damages of $2,500 per VPPA violation and $500 per § 1799.3 violation, punitive damages, and injunctive relief "prohibiting Dotdash Meredith from disclosing Registered Users' Facebook IDs and video-viewing history on People.com." *Id.*, Prayer for Relief, at 43.

## LEGAL STANDARDS

**Rule 12(b)(1).** To establish Article III standing, a plaintiff must show that she has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Grand River Enters. Six Nations, Ltd. v. Boughton*, 988 F.3d 114, 120 (2d Cir. 2021) (citation omitted). The injury in fact "must be 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Liberian Cmty. Ass'n of Conn. v. Lamont*, 970 F.3d 174, 184 (2d Cir. 2020) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

On a pleading-stage Rule 12(b)(1) motion, "the defendant may challenge either the legal or factual sufficiency of the plaintiff's assertion of jurisdiction, or both." *Robinson v. Gov't of Malaysia*, 269 F.3d 133, 140 (2d Cir. 2001). A facial challenge must rely solely on the allegations in the complaint. *Katz v. Donna Karan Co.*, 872 F.3d 114, 119 (2d Cir. 2017). In a fact-based challenge, on the other hand, the defendant may "proffer[] evidence beyond the [p]leading." *Id.* Then, the plaintiff must either "come forward with evidence of their own to controvert that presented by the defendant" or "rely on the allegations in the [p]leading." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 56–57 (2d Cir. 2016). If "jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the

pleadings, such as affidavits." *Boelter v. Hearst Commc'ns, Inc.*, 269 F. Supp. 3d 172, 183 (S.D.N.Y. 2017) (quoting *APWU v. Potter*, 343 F.3d 619, 627 (2d Cir. 2003)); *see also Broidy Cap. Mgmt. LLC v. Benomar*, 944 F.3d 436, 444 n.7 (2d Cir. 2019) ("deferral of a jurisdictional issue until trial is an extremely unusual situation") (internal quotations and citation omitted).

**Rule 12(b)(6).** To survive a Rule 12(b)(6) motion to dismiss, a complaint must set forth "factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). While a court generally accepts factual assertions as true, it does not credit "conclusory statements" or "threadbare recitals," *Wilson v. Triller, Inc.*, No. 21-cv-11228 (JSR), 2022 WL 1138073, at *3 (S.D.N.Y. Apr. 18, 2022), nor does it give any weight to "general allegations that are contradicted by more specific allegations in the [c]omplaint," *Lamda Sols. Corp. v. HSBC Bank USA, N.A.*, 574 F. Supp. 3d 205, 217 (S.D.N.Y. 2021) (citation omitted). Likewise, the court does not credit factual assertions "contradicted by . . . documents upon which the pleadings rely, or by facts of which the court may take judicial notice." *Perry v. NYSARC, Inc.*, 424 F. App'x 23, 25 (2d Cir. 2011).

In deciding a Rule 12(b)(6) motion, the court may consider documents incorporated by reference. *See Sira v. Morton*, 380 F.3d 57, 67 (2d Cir. 2004) ("A complaint is deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint.") (citations omitted). Documents are deemed incorporated where they are "quoted in the complaint," *In re Parmalat Secs. Litig.*, 375 F. Supp. 2d 278, 285 (S.D.N.Y. 2005), or are "documents the plaintiff either possessed or knew about and upon which they relied in bringing the suit." *Rothman*, 220 F.3d at 88 (citation omitted); *see also Derbaremdiker v. Applebee's Int'l, Inc.*, No. 12-CV-01058

(KAM), 2012 WL 4482057, at *3 (E.D.N.Y. Sept. 26, 2012), *aff'd,* 519 F. App'x 77 (2d Cir. 2013) (screenshots of defendant's website "quoted in . . . the complaint" are deemed incorporated). Where, as here, the contents of a "website are at the center of [a plaintiff's] allegations," the website "is incorporated by reference." *Atl. Recording Corp. v. Project Playlist, Inc.*, 603 F. Supp. 2d 690, 694 n.3 (S.D.N.Y. 2009) (citation omitted). The contents of the website are assumed to be accurately depicted, and the Court may conduct its "own review" of the website. *Id.*; *see, e.g.*, *Thorn v. Formula 1 Motorsports, Inc.*, No. 19-CV-1077 (JPO), 2019 WL 6916098, at *3 n.2 (S.D.N.Y. Dec. 19, 2019) (reviewing incorporated website to determine plausibility of pleadings).

## ARGUMENT

## I.  PLAINTIFF LACKS ARTICLE III STANDING

Plaintiff lacks Article III standing because he has not suffered any injury in fact. The Complaint alleges a single injury that applies to all claims: "[w]hen [Plaintiff] views video content on People.com, the Facebook Pixel on that page causes the [] browser to send information about that video, including its title, and the consumer's Facebook ID, to Facebook," thereby invading Plaintiff's privacy in his video-viewing habits. Compl. ¶ 120; *see also id.* ¶¶ 3, 84, 133–37; *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017) (the VPPA "codifies a context-specific extension of the *substantive* right to privacy"). The alleged privacy injury is demonstrably false both on the face of the Complaint and in light of the actual transmission of data to Facebook via the Facebook Pixel.

The VPPA protects a single, narrow privacy right for Article III purposes. Thus, courts analyzing standing under the VPPA have uniformly held that "the VPPA creates a right to the privacy of one's video-watching history, the deprivation of which—through wrongful disclosure, or statutory violation, alone—constitutes an injury sufficient to confer Article III standing." *Austin-Spearman v. AMC Network Entm't LLC*, 98 F. Supp. 3d 662, 666–67 (S.D.N.Y. 2015)

(citing *Sterk v. Redbox Automated Retail, LLC*, 770 F.3d 618, 623 (7th Cir. 2014)). This tightly cabined injury is consistent with the Supreme Court's Article III jurisprudence. *See TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021) ("[I]ntangible harms can [] be concrete. Chief among them are injuries with a close relationship to harms traditionally recognized as providing a basis for lawsuits in American courts," including "disclosure of private information[.]").[10]

Plaintiff attempts to establish this specific privacy injury through the below screenshot, which purportedly reflects information sent to Facebook via a "GET Request" when a user visits a People.com webpage with the URL https://people.com/movies/ryan-reynolds-hilariously-trolls-wife-blake-lively-on-her-birthday ("Reynolds Article"):



---

[10] The allegation that Plaintiff and putative class members lost control over their information and suffered emotional distress, Compl. ¶ 133, does not change the Article III analysis, since these "harms" flow from alleged disclosure itself. *Ramirez*, 141 S.Ct. 2190, 2211 n.7.

Compl. ¶ 122. Plaintiff claims the first outlined box reveals the title of the video segment allegedly viewed when a user visited the page containing the Reynolds Article. The incorporated website, however, shows this is *not* the title of the *video*, but rather the title of the *article*: "Ryan Reynolds Hilariously Trolls Wife Blake Lively on Her Birthday." Ex. 3 to Kasner Decl. The video clip embedded in the Reynolds Article has an altogether different title: "Ryan Reynolds on How Blake Lively Has Made Him 'The Father of My Dreams.'"[11] The Complaint therefore alleges only that the Facebook Pixel sends the *article* title to Facebook via the GET Request, not the *video* title.

Of course, disclosing the title of an article to Facebook does not invade "the privacy of one's video-watching history," the only possible injury in fact under the VPPA. *Austin-Spearman*, 98 F. Supp. 3d at 666. Even disclosing the title of a video embedded in an article would not, in itself, disclose that a video was viewed (as opposed to merely being present on the page) and, therefore, would not constitute a privacy injury under VPPA. *See id.* And because Plaintiff pleads the same privacy injury for all of his claims, the failure to allege facts demonstrating an actual violation of that interest is fatal to all of them. *See McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 303–04 (2d Cir. 2021) (affirming dismissal of multiple claims for lack of standing because each claim was predicated on the same injury: future risk of identity theft or fraud). Consequently, it is clear from the face of the Complaint that Plaintiff has not suffered any injury in fact, and he therefore lacks Article III standing. *See Lujan*, 504 U.S. at 560; *see also Austin-Spearman*, 98 F. Supp. 3d at 666 (explaining "the VPPA creates a right to the privacy of one's

---

[11] *See* Ex. 3 to Kasner Decl. This webpage is incorporated by reference in Plaintiff's complaint. Comp. ¶ 122.

video-watching history"); *Eichenberger*, 876 F.3d at 983 (VPPA "codifies a context-specific extension of the *substantive* right to privacy") (emphasis in original).[12]

Further, the Choi Declaration[13] demonstrates that no amended pleading could satisfy Article III because no data is ever transmitted to Facebook by Dotdash Meredith that reveals any specific video was watched or requested by a People.com user. The Choi Declaration explains that the user's browser shares information about People.com's webpages via the Facebook Pixel through two methods: GET Requests, Compl. ¶ 122, and POST Requests, Choi Decl. at ¶ 4. Both types of requests transmit data to Facebook only when a website visitor opens and loads a People.com page, and at no other time. *Id.* at ¶ 5. Because information is shared only during the very short interval when a page loads, no information about what a user does once on that page is shared, including whether they watched or requested any video content. *Id.* Specifically, no information about whether a user plays, pauses, or fast-forwards video content is sent to Facebook. *Id.* at ¶¶ 5, 10, 14, 18. Furthermore, some People.com articles contain multiple videos, while others have none, such that an article's URL cannot serve as a proxy for a particular video, must less its title. *Id.* at ¶ 5. Other articles, like the Fallon Article, contain embedded videos that link to third-party websites, like YouTube; in such instances, no information about the embedded video is transferred. *Id.* at ¶ 18. Taken together, these facts show that People.com does not share users' video-watching history with Facebook, *id.* at ¶ 20, and so Plaintiff has not experienced an injury in fact and, thus, has no standing. *See Santana v. Take-Two Interactive Software, Inc.*, 717 F. App'x 12, 15–16 (2d Cir. 2017) (dismissing claim for lack of injury in fact where plaintiffs' and

---

[12] To the extent Plaintiff alleges an Article III injury from a purely procedural statutory violation—for example, the OPPA claim—this is not sufficient. *See Ramirez*, 141 S. Ct. at 2213 ("bare procedural violation[s], divorced from any concrete harm," do "not suffice for Article III standing") (citing *Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016)).

[13] The Declaration of Junsu Choi is properly before for Court because a party advancing a fact-based challenge to Article III standing may introduce extrinsic evidence. *See Katz*, 872 F.3d at 119; *Carter*, 822 F.3d at 57.

defendant's activities demonstrated "[n]o reasonable person [] would believe" defendant's presentation of their face scan technology "resulted in plaintiffs' biometric data being used or disclosed without their consent").

Because Plaintiff fails to demonstrate standing and could not do so under any set of facts, this Court lacks jurisdiction over the claims and should dismiss the Complaint without leave to amend. *See W.R. Huff Asset Mgmt. Co. v. Deloitte & Touche LLP*, 549 F.3d 100, 106 (2d Cir. 2008).

## II.   PLAINTIFF FAILS TO ALLEGE A VIOLATION OF THE VPPA

Plaintiff fails to state a claim under the VPPA for four key reasons. First, the allegedly disclosed information—Facebook-created cookies containing numerical Facebook IDs and the URLs for People.com articles—is not PII because it does not identify a person or any specific video requested or obtained by a person. Second, Plaintiff does not sufficiently allege that any such disclosure was knowing. Third, People.com is not a "video tape service provider" under the VPPA. 18 U.S.C. § 2710(a)(4). And finally, the short video clips at issue are not "prerecorded video cassette tapes" or "similar audio visual materials" within the meaning of the statute. *Id.*

### A.   The VPPA

Congress enacted the VPPA in response to the publication of 146 movie titles then-Judge Robert M. Bork had rented from a local video store around the time of his nomination to the U.S. Supreme Court. Andrea Peterson, *How Washington's Last Remaining Video Store Changed the Course of Privacy Law*, Washington Post (Apr. 28, 2014). True to its origins, the VPPA only prohibits the "knowing[]" disclosure of "personally identifiable information" ("PII") by "video tape service provider[s]" that "identifies a person as having requested or obtained specific video materials." 18 U.S.C. §§ 2710(a)(3), (b)(1). "'Video tape service provider[s]'" are limited to those "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or

similar audio visual materials." *Id.* § 2710(a)(4). When Congress passed the VPPA in 1988, it deliberately excluded from the law's scope the very types of media—books, magazines, newspapers, and television—through which entertainment news was distributed at that time.[14] And when Congress amended the VPPA in 2013, it chose not to expand the law's reach to other media.[15] As explained below, Dotdash Meredith's alleged conduct simply does not fall within the scope of the statute.

### B.   Plaintiff Fails to Allege a Knowing Disclosure of PII

Plaintiff's VPPA claim fails because the alleged disclosure to Facebook does not satisfy the statutory definition of PII. Plaintiff must plead facts showing that People.com knowingly conveyed information identifying "specific video materials or services" and "identifying the person" who requested or obtained the materials or services. 18 U.S.C. § 2710(a)(3). To state a viable VPPA claim, it is "plaintiff's burden" to plead (and then prove) "three distinct elements[]" and the accompanying *mens rea* for each: "the video-service provider" must "actually kn[o]w that it was disclosing: 1) a user's identity; 2) the identity of the video material; and 3) the connection between the two—*i.e.*, that the given user had 'requested or obtained' the given video material." *In re Hulu Priv. Litig.*, 86 F. Supp. 3d 1090, 1095, 1097 (N.D. Cal. 2015) ("*Hulu III*") ("The point of the VPPA, after all, is not so much to ban the disclosure of user or video data; it is to ban the disclosure of information connecting a certain user to certain videos."). Plaintiff has not plausibly

---

[14] Although the VPPA's original text included "a restriction on the disclosure of library borrower records," Congress removed this provision prior to enactment because it "could not resolve questions regarding the application of such a provision for law enforcement." S. Rep. No. 100-597 (1988), at 8.

[15] *See* Video Privacy Protection Act Amendments Act of 2012, Pub. L. No. 112-258, 126 Stat. 2414 (2013); *The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century*, Hearing on H.R. 2471 Before the Subcomm. on Privacy, Technology, and the Law, 112th Cong. (2nd Sess. Jan. 31, 2012) (Statement of William McGeveran) ("Unintended disclosure of a user's choices of books, music, films, or Web sites can also constrain the capacity to experiment and explore ideas freely. If the Committee revisits this statute, I believe you should consider extending protection to reading and listening habits as well as viewing.").

alleged that Dotdash Meredith knowingly transmitted information through People.com that could be used by a third party to identify a specific video or a specific consumer, let alone a connection between them. *Id.*

### 1. The Information at Issue Is Not PII Because It Does Not Identify "Specific Video Materials or Services"

The VPPA defines PII as information that identifies a person as having "requested or obtained ***specific video materials*** or services." 18 U.S.C. § 2710(a)(3) (emphasis added). "Specific" means "definite; explicit; of an exact or particular nature." *Specific*, Black's Law Dictionary (6th ed. 1990). Thus, to qualify as PII, the information must identify the exact video a person requested or watched. Though the Second Circuit has not reached this question, other Courts of Appeals have concluded that "specific video materials or services" means "particular videos . . . watched." *In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 285 (3d Cir. 2016) ("*Nickelodeon II")*; *Eichenberger*, 876 F.3d at 984 ("'personally identifiable information' . . . identifies an individual as having watched certain videos"). Every district court that has analyzed the phrase "specific video materials or services" has reached the same conclusion: the information disclosed must enable a third party to ascertain the precise video a person "requested or obtained." *See, e.g.*, *United States v. Shultz*, No. 16-10107-01 (EFM), 2018 WL 534333, at *3–4 (D. Kan. Jan. 24, 2018); *FTC v. Amazon.com, Inc.*, No. C14-1038-JCC, 2015 WL 11256312, at *2–3 (W.D. Wash. Aug. 3, 2015); *Amazon.com LLC v. Lay*, 758 F. Supp. 2d 1154, 1170 (W.D. Wash. 2010); *Gonzalez v. Cent. Elec. Coop. Inc.*, Civ. Nos. 08–6236–HO, 08–6240–HO, 2009 WL 3415235, at *11 (D. Or. Oct. 15, 2009).

Plaintiff does not plausibly allege that People.com discloses the titles of any videos requested or obtained by any users, or any other information sufficient to identify specific videos watched by users. Instead, Plaintiff merely alleges that People.com sends "the address of the

[People.com] webpage where they are watching the video." Compl. ¶ 82. But—for several reasons evident on the face of the Complaint and the People.com website itself—disclosing the webpage a user visited does not equate to disclosing the specific video clips on that page, if any, that were in fact watched. First, Plaintiff concedes that not all People.com webpages contain a video clip, *id.* ¶ 55 (indeed, many do not, *see* Ex. 4 to Kasner Decl.),[16] and so a user's mere navigation to articles about a celebrity's preferred running shoes or the late Queen Elizabeth reveals nothing about the user's video-viewing history.[17] *See FTC*, 2015 WL 11256312, at *2–3 (in-app purchase records, which may but do not necessarily implicate video history, are not PII). Second, certain People.com webpages contain multiple video clips. Ex. 6 to Kasner Decl. Plaintiff does not explain how visiting such a webpage amounts to requesting or obtaining a "specific" video. Compl. ¶¶ 116–27; Exs. 4–6 to Kasner Decl. (containing images of People.com articles and homepage with no videos or multiple videos). Third, even for a webpage containing a single video (and Plaintiff never alleges visiting any particular one, *see* Compl. ¶ 13), nothing in the webpage URL reveals what the user did once having landed on the page, or even whether the page contains video content. In fact, the *Meta Pixel* documentation incorporated in the Complaint confirms that the default settings allegedly used on People.com "tell[] you if someone visits a web page's URL, but *not what they see or do on that page.*" *See supra* n.9 (emphasis added). Whether Plaintiff (or any other putative class member) "requested or obtained" a video after navigating to a particular webpage is utter

---

[16] Exhibits 3–6 attached to the Kasner Declaration are screenshots from People.com's website, which is central to Plaintiff's Complaint and therefore incorporated by reference. *See supra* Legal Standards at 8. Moreover, "a court may take judicial notice of information publicly announced on a party's website, as long as the website's authenticity is not in dispute and it is capable of accurate and ready determination." *Doron Precision Sys., Inc. v. FAAC, Inc.*, 423 F. Supp. 2d 173, 179 n.8 (S.D.N.Y. 2006) (internal quotations omitted); *see also PK Music Performance, Inc. v. Timberlake*, No. 16-CV-1215 (VSB), 2018 WL 4759737 at *5 (S.D.N.Y. Sept. 30, 2018) (taking judicial notice of "screenshots of websites" contained in attorney declarations).

[17] *E.g.*, Ex. 4 to Kasner Decl.; Simon Perry and Michele Tauber, *Queen Elizabeth, the Longest-Reigning British Monarch, Dies at 96*, People.com (Sept. 8, 2022), https://people.com/royals/queen-elizabeth-dead-british-monarch-age-96/.

conjecture.

Plaintiff nonetheless contends that "the name of the video was transmitted to Facebook" because it can be found in the webpage URL, for instance:



Compl. ¶¶ 122–23. This assertion is demonstrably false, as is clear from Plaintiff's own example. As explained above, *supra* Part I, there is no video on People.com entitled "ryan-reynolds-hilariously-trolls-wife-blake-lively-on-her-birthday." Instead, navigating to that URL reveals an ***article*** with this title, and the article contains an embedded video segment with a ***different*** title: "Ryan Reynolds on How Blake Lively Has Made Him 'The Father of My Dreams.'"[18] Plaintiff's assertion, then, that if a user happens to "visit[] a people.com webpage with a video, the name of the video is reflected in the name of the webpage," Compl. ¶ 118, is simply inaccurate based on the example Plaintiff provides in his own Complaint. Even if the title of a video embedded in an article were disclosed, however, there is no allegation (and there could be none) that information about whether a user actually viewed the video is ever transmitted. Disclosing that a user visited a webpage without indicating anything about what the user did once there does not reveal that the user requested or obtained a particular video.

In search of PII where none exists, Plaintiff next attempts a sleight of hand: though the Complaint clearly alleges that People.com transmits, via the Facebook Pixel, the "address of the webpage," Plaintiff quietly pivots, without explanation, to alleging that People.com transmits "the

---

[18] *Compare* Katie Campione, *Ryan Reynolds Hilariously Trolls Wife Blake Lively on Her Birthday*, People.com (Aug. 26, 2021), https://people.com/movies/ryan-reynolds-hilariously-trolls-wife-blake-lively-on-her-birthday, *with Ryan Reynolds on How Blake Lively Has Made Him "The Father of My Dreams,"* People.com (embedded therein).

URL of the video" on that webpage, *e.g.*, Compl. ¶ 84. Plaintiff never says what the "URL of the video" means or is, and every People.com URL referenced in the Complaint resolves to an article, not a video. The Complaint's "video URL" allegation conflates two distinct concepts: (a) a webpage's URL; and (b) a video that might be embedded on that webpage. Plaintiff's shifty pleading only underscores this critical flaw.

Nor does Plaintiff's "auto-play" allegation salvage the VPPA claim. Compl. ¶ 119 (alleging "the video will 'auto-play' when the user lands on the page"). Even if this allegation were true, the VPPA applies only to records showing that a viewer "requested or obtained" certain material. Both "request" and "obtain" require an active choice to seek out the item in question, not merely passive receipt. *Request*, Merriam-Webster.com, https://www.merriamwebster.com/dictionary/request (last visited Sept. 16, 2022) (defining "request" as "the act or instance of asking for something"); *Obtain*, Merriam-Webster.com, https://www.merriam-webster.com/dictionary/obtain (last visited Sept. 16, 2022) ("to gain or attain usually by planned action or effort"). Video content that auto-plays when a user navigates to a webpage to read an article does not reflect that the user "attain[ed]" it "by planned action." Nor does the presence of such content alongside an article mean that a user "asked for" the video, any more than one asks for the ads accompanying the article, or for a video billboard to be playing in Times Square as they walk by.[19] In short, an article webpage's URL does not reveal whether a People.com user watched or obtained any video, let alone a particular video.

---

[19] The auto-play allegation is likewise of no moment for Plaintiff's burden to allege the third "distinct element[]"of PII: "that the given user had 'requested or obtained' the given video material." *Hulu III*, 86 F. Supp. 3d at 1095.

### 2.    The Information at Issue Is Not PII Because It Does Not "Identif[y] a Person"

Just as Plaintiff fails to allege the disclosure of specific video materials watched by People.com users, he does not plausibly claim their *identities* are disclosed.

### a.    The C_User Cookie Is Not PII

Plaintiff alleges that Facebook installs a c_user cookie on its users' browsers, and Facebook then associates the cookie with the user's Facebook ID, a "unique and persistent identifier" that "typically is a string of numbers." Compl. ¶¶ 88, 95, 122–23, 160. Plaintiff's broad theory, that a unique string of numbers constitutes PII, fails under established precedent. "Through [the VPPA's] enactment, Congress sought 'to prevent disclosures of information that would, with little or no extra effort, permit an ordinary recipient to identify a particular person's video-watching habits.'" *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230, at *8 (S.D.N.Y. Aug. 11, 2017) (quoting *Nickelodeon II*, 827 F.3d at 284). Accordingly, most courts to consider this issue have held that PII is limited to "the kind of information that would readily permit an ordinary person to identify a specific individual's video-watching behavior." *Nickelodeon II*, 827 F.3d at 290; *see also Eichenberger*, 876 F.3d at 985 (noting that "ordinary person" interpretation of PII "fits most neatly with the regime that the VPPA's enacting Congress likely had in mind"). As Judge Abrams explained:

> [T]he most natural reading of PII suggests that it is the information actually "disclos[ed]" by a "video tape service provider," [] which *must itself* do the identifying that is relevant for purposes of the VPPA (literally, "information which identifies")—not information disclosed by a provider, plus other pieces of information collected elsewhere by non-defendant third-parties.

*Robinson v. Disney Online*, 152 F. Supp. 3d 176, 182 (S.D.N.Y. 2015) (emphasis added); *see also Wilson*, 2022 WL 1138073, at *6 ("[a]s a matter of statutory interpretation," the "ordinary person" interpretation "is the correct one").[20]

As alleged, the only "identifying" information sent to Facebook is the Facebook ID: a "string of numbers." Compl. ¶¶ 88–90. Courts have consistently "held that an anonymous string of numbers . . . is insufficient to qualify as personally identifiable information." *Perry v. CNN, Inc.*, No. 1:14-CV-02926-ELR, 2016 WL 4373708, at *4 (N.D. Ga. Apr. 20, 2016) (app ID number is not PII); *e.g.*, *Eichenberger v. ESPN, Inc.*, No. C14-463-TSZ, 2015 WL 7252985, at *5 (W.D. Wash. May 7, 2015) (Roku device serial number is not PII); *Ellis v. Cartoon Network, Inc.*, No. 1:14-CV-484-TWT, 2014 WL 5023535, at *3 (N.D. Ga. Oct. 8, 2014) (Android ID is not PII); *In re Nickelodeon Consumer Priv. Litig.*, No. 2443 (SRC), 2014 WL 3012873, at *10 (D.N.J. Jul. 2, 2014) ("*Nickelodeon I*") (IP address and unique device identifier are not PII); *In re Hulu Priv. Litig.*, No. C 11-03764-LB, 2014 WL 1724344, at *12 (N.D. Cal. Apr. 28, 2014) ("*Hulu II*") (unique identifier is not PII); *cf. Bernardino*, 2017 WL 3727230, at *9 (noting, in preliminary injunction context, "there is no binding precedent" holding that a Facebook cookie containing a "Facebook ID" can constitute PII). After all, an "ordinary person" would not know (a) what the otherwise unlabeled string of numbers means, and (b) once that meaning is clear, how to convert those numbers to find the user's Facebook account. *See, e.g.*, *Capitol Records, LLC v. Vimeo, LLC*, 826 F.3d 78, 93–94 (2d Cir. 2016) (holding in the copyright context that "[t]he hypothetical 'reasonable person' to whom infringement must be obvious is an ordinary person—not endowed with specialized knowledge or expertise").

---

[20] The First Circuit has adopted an outlier view in *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482 (1st Cir. 2016), holding that an otherwise anonymized identifier can be PII where a sophisticated recipient can theoretically match an identifier to a name. In *Wilson*, 2022 WL 1138073, at *6, Judge Rakoff expressed skepticism about *Yershov* and declined to adopt it because "[i]t would make little sense for the scope of PII to be recipient-dependent."

Yet that is what Plaintiff posits. He suggests an "ordinary person" would know that a string of numbers in the c_user cookie is actually a Facebook ID. Plaintiff further assumes an ordinary person would know to attach that opaque string of numbers to the end of a default www.facebook.com URL, bringing her to the user's Facebook page. *Id.* ¶ 90. This Court has rejected this type of conjecture—"information which is not otherwise PII" cannot "somehow become PII because of the potential . . . of a third party to 'reverse engineer' a disclosure." *Robinson*, 152 F. Supp. 3d at 183; *see Wilson*, 2022 WL 1138073, at *5 (disapproving of argument that information is PII because recipients "would be able to combine it with other information so as to deduce" a user's identity).[21] Instead, to be PII, the information "must ***itself*** do the identifying that is relevant for purposes of the VPPA (literally, 'information which identifies')." *Robinson*, 152 F. Supp. 3d at 182 (emphasis added).[22]

### b.    The Complaint Does Not Allege That Dotdash Meredith Discloses the Numerical ID

Even if the string of numbers in the c_user cookie were PII (it is not), Plaintiff's claim still fails because there is no plausible allegation that Dotdash Meredith discloses this information. Under the VPPA's plain text, there can be liability only where ***the defendant*** knowingly discloses PII to a third party. 18 U.S.C. § 2710(b)(1). Here, Plaintiff's own allegations make clear that

---

[21] In *Hulu II*, the court found a triable issue of fact as to whether a Facebook ID alone constitutes PII. 2014 WL 1724344, at *14. On this point, *Hulu II* is likely an outdated artifact: the Ninth Circuit's subsequent decision in *Eichenberger* adopting the "ordinary person" standard strongly suggests that a Facebook ID, by itself, cannot constitute PII. *See* 876 F.3d at 986 (identifying "names and addresses," "name and telephone number," "name and birthday," an "email address," and a "link" to a "Facebook" profile as examples of PII). And the Third Circuit has expressly diverged from *Hulu II* and its progeny's interpretation of PII.  *Nickelodeon II*, 827 F.3d at 286.

[22] That Facebook, as the recipient, might be able to understand that the c_user cookie is transmitting a Facebook ID is of no moment. Under the "ordinary person" approach, "the scope of PII" is not "dependent on the specifics of the recipient of the disclosure." *Wilson*, 2022 WL 1138073, at *6; *see Eichenberger*, 876 F.3d at 985; *Nickelodeon II*, 827 F.3d at 290.

Dotdash Meredith is not giving Facebook any information with respect to the user's identity: indeed, Facebook itself creates the c_user cookie containing the Facebook ID.

Plaintiff concedes as much: "*Facebook.com* installs cookies into a user's device[.]" Compl. ¶ 95 (emphasis added); *e.g.*, *id.* ¶¶ 90, 91, 94. Then, "when a user logs into his or her *Facebook account*, the cookie identifying the user's device is associated with the user's Facebook ID." *Id.* ¶ 96 (emphasis added); *see also id.* ¶ 95 ("**facebook.com** . . . direct[s] the browser to set up a 'c_user' cookie with the user's public id" (emphasis added)). The cookie only remains on the user's browser if the user *chooses* to remain logged into Facebook. *Id.* ¶ 96. And only then, using "cookies created when that user previously logged into Facebook," *id.* ¶ 113, can Facebook allegedly read the cookie information that it already has, including the Facebook ID, via the Pixel, *id.* ¶ 5.

Plaintiff's generalized assertion that "Dotdash Meredith shares . . . the identification of the *viewer* of the video with third parties," *id.* ¶ 82 (emphasis added), thus is contradicted by the Complaint's specific allegations and therefore cannot be credited. *See supra* Part II(B)(2). There is no allegation that Dotdash Meredith places the c_user cookie on the user's browser, or that it can read the contents of this third-party cookie, or that it transmits the c_user cookie to Facebook. Indeed, the Complaint's incorporated documents confirm the transmission is between the user's browser and Facebook. Compl. ¶ 113 n.38. That is not enough to state a viable VPPA claim because, as to the user's identity, Dotdash Meredith is not the one making the disclosure. *See Hulu III*, 86 F. Supp. 3d at 1095.

### 3.      Plaintiff Fails to Allege That People.com Knowingly Transmitted PII

Plaintiff also fails to allege a knowing disclosure—*i.e.*, that Dotdash Meredith knew it was disclosing to Facebook both user identities and the People.com videos they had watched *and* that Facebook was pairing this information. "[T]he term 'knowingly' connotes actual knowledge. It is

not enough . . . that a disclosure be merely 'voluntary' in the minimal sense of the defendant's being 'aware of what he or she is doing[.]'" *Hulu III*, 86 F. Supp. 3d at 1095 (citing 18 U.S.C. § 2710(b)(1)). "[T]he knowledge element of the VPPA violation is intertwined with the definition of PII. If [the defendant] did not think it was conveying PII, then there could be no knowledge of the conveyance, regardless of whether it knew what Facebook might do with the information." *Bernardino*, 2017 WL 3727230, at *9.

Instead of alleging a knowing disclosure of PII, Plaintiff merely claims that "Dotdash Meredith's decision to install the Facebook Pixel on People.com was an intentional act," showing it "knowingly and willfully disclosed" PII. Compl. ¶ 131. Plaintiff misapprehends the inquiry. "'[K]nowingly' means consciousness of transmitting the private information. It does not merely mean transmitting the code," or the defendant's knowledge of such code transmission. *Hulu III*, 86 F. Supp. 3d at 1095. Plaintiff's allegation that Dotdash Meredith decided to incorporate the Facebook Pixel into People.com (which would only disclose "the name of the website being viewed") is insufficient. Compl. ¶ 111; *see id.* ¶¶ 101–15. And every other theory underlying Plaintiff's claim fails to rise "above the speculative level," *Wilson*, 2022 WL 1138073, at *3. There are no well-pleaded allegations that Dotdash Meredith had knowledge that: (a) People.com users with Facebook accounts would allow Facebook to incorporate cookies into their browsers; (b) Facebook would pair the c_user cookie information with the article URL information (if it ever did);[23] or (c) Facebook would navigate to that article URL, find a video clip (if there was one), and infer that a particular user watched the clip (if he ever did). Surmise is no substitute for well-

---

[23] Indeed, Plaintiff merely asserts, "on information and belief," that "Facebook automatically associates Facebook IDs with the identity of the videos transmitted to it," Compl. ¶ 90—a threadbare, conclusory assertion rendered implausible by the fact that Facebook receives webpage URLs, not video identities or titles, through Pixel. *See Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (pleading on information and belief must be based on "factual information that makes the inference of culpability plausible").

pleaded allegations of knowledge.

### C.    People.com Is Not a Video Tape Service Provider

Plaintiff's VPPA claim fails for the additional reason that People.com is not a "video tape service provider." The VPPA protects viewers' privacy as to the movies they watch, not the online articles they read. That is why the law only applies to a disclosure by a "video tape service provider"—an entity "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials." 18 U.S.C. § 2710(a)(4); *Nickelodeon I*, 2014 WL 3012873, at *7 ("[O]nly VTSPs can violate the VPPA . . . ."). By its plain terms, the VPPA requires both (a) that the entity be engaged in the business of providing prerecorded video cassette tapes or similar audio visual materials, and (b) that the materials themselves be prerecorded video cassette tapes or similar audio visual materials. People.com does not meet either requirement. It is a free website containing entertainment news articles. Compl. ¶¶ 1–3, 139; *see also* https://people.com. While some articles contain short, embedded videos, others do not. Compl. ¶¶ 55–56. And the video clips in the Complaint bear no resemblance to what the VPPA was designed to regulate: feature films or similar programming captured on video cassettes or similar media.

####     1.    People.com Is Not Engaged in the Business of Renting, Selling, or Delivering Prerecorded Video Cassette Tapes or Similar Audio Visual Materials

The VPPA regulates only those entities "engaged in the business . . . of rental, sale, or delivery of prerecorded video cassette tapes or similar audio visual materials," 18 U.S.C. § 2710(a)(4), *i.e.*, businesses whose core function or primary business purpose is video rental or sale. "In determining the proper interpretation of a statute, a court will 'look first to the plain language of a statute and interpret it by its ordinary, common meaning.'" *Cheung v. Bristol-Myers Squibb Co.*, 282 F. Supp. 3d 638, 643 (S.D.N.Y. 2017) (quoting *Tyler v. Douglas*, 280 F.3d 116, 122 (2d Cir. 2001)). "When used in this context, 'business' connotes 'a particular field of endeavor,

*i.e.*, a focus of the defendant's work.'" *In re Vizio, Inc. Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1221 (C.D. Cal. 2017) (citing Webster's Third New International Dictionary 302 (1981) (def. 1d)).[24] To say an entity "is in the business of" conveys that "it was formed for th[at] purpose[.]" *Dish Network Corp. v. Ace Am. Ins. Co.*, 431 F. Supp. 3d 415, 419 (S.D.N.Y. 2019), *aff'd*, 21 F.4th 207 (2d Cir. 2021).

The "in the business of" requirement is a substantive "textual limitation[]" that "cabin[s] the scope of the [VPPA]." *Vizio*, 238 F. Supp. 3d at 1222. "[T]he defendant's product must not only be substantially involved in the conveyance of video content to consumers but also significantly tailored to serve that purpose." *Id.* at 1221. Conversely, "developers of many other products or services that might be peripherally or passively involved in video content delivery do not fall within the statutory definition of a video tape service provider." *Id.* at 1221–22.

The Complaint fails to plausibly allege that People.com is in the business of video sale, rental, or delivery. Incorporated documents make clear that People.com is in the "book and periodical publishing" industry and is the "#1 source for celebrity news and inspiring stories." Compl. ¶ 60 & n.32. Many People.com articles do not contain any video content. Exs. 5–6 to Kasner Decl.; *see also* Compl. ¶ 55 (conceding that not all content pages include a video). Plaintiff's conclusory assertion that "[v]ideo content is a major focus of People.com," Compl. ¶ 55, falls well short of alleging People.com is both "significantly tailored to serve th[e] purpose" of delivering video content and "intimately involved in the delivery of video content to consumers[.]" *Vizio*, 238 F. Supp. 3d at 1222.[25] The Complaint does not, for instance, allege that People.com is

---

[24] Use of dictionary definitions is appropriate to determine the "ordinary, common-sense meaning of [a statute's] words." *United States v. Rowland*, 826 F.3d 100, 108 (2d Cir. 2016) (citation omitted).

[25] Plaintiff asserts that People.com's "Media Kit" "emphasizes its video content." Compl. ¶ 58. Yet the only reference to "video" at the link Plaintiff provides is to PeopleTV, an altogether different service and website than People.com. *Id*. ¶ 58 n.30 (linking to 2020 Media Kit).

"designed to enable consumers to seamlessly access" streaming content, advertises itself as a movie platform, or has entered into agreements with "content providers such as Netflix and Hulu." *Id.*

Furthermore, Plaintiff's proposed construction—that the mere presence of video clips on a website makes it "in the business of" providing videos—would sweep all manner of online activity within the purview of an otherwise narrowly drawn statute. A real-estate website offering a 3D video tour, a newspaper's online edition with video reporting alongside its written articles, and a home improvement store offering do-it-yourself tutorial videos—all would be "video tape service providers" under the VPPA. Neither the text nor the purpose of the VPPA supports this extraordinary expansion of the statute's narrow focus on video tape service providers to encompass much of the Internet as we know it.[26]

### 2. Minutes-Long Entertainment and Montage Clips Are Not "Prerecorded Video Cassette Tapes" or "Similar Audio Visual Materials"

In addition to People.com not being "in the business" of providing video content, the short clips referenced in the Complaint are not "prerecorded video cassette tapes or similar audio visual materials[.]" 18 U.S.C. § 2710(a)(4). The Complaint's first-referenced clip is a 7-minute YouTube excerpt from *The Tonight Show Starring Jimmy Fallon*. Compl. ¶ 55. The second clip is a 70-second entertainment news story about the celebrity Kim Kardashian passing the "baby bar exam." *Id.* ¶ 56. Neither is anything like the VHS tapes contemplated by the statute, and Plaintiff does not even attempt to allege as much. Nor are the video clips "similar audio visual materials" to the

---

[26] The Complaint misleadingly includes an excerpt from an article where a Meredith employee says the company is "interested in developing a long-form video strategy." Compl. ¶ 50 n.27. The article concerns a recently launched show on Food & Wine—an entirely different online property—not People.com. *See Nickelodeon I*, 2014 WL 3012873, at *8 (finding that where "YouTube videos [we]re irrelevant to th[e] lawsuit," "Google's ownership of YouTube d[id] not bring Google within the [VPPA's] ambit in th[e] case.").

feature-length films rented by Judge Bork that led Congress to pass the VPPA. "Similar" means "[n]early corresponding; resembling in many respects; somewhat like; having a general likeness." *Similar*, Black's Law Dictionary (6th ed. 1990); *see also United States v. Stanko*, 491 F.3d 408, 414 (8th Cir. 2007) (defining "similar" as "comparable" or "nearly corresponding"). Short entertainment news clips do not resemble, nearly correspond to, or "resemble[e] in many respects" the rental movies that prompted the VPPA's passage.

Had Congress intended to regulate *any* video content, it certainly could have done so. For example, Congress could have defined "video tape service provider" as an entity in the business of delivering prerecorded video cassette tapes or "any other audio-visual materials," or even "other audio-visual materials." But that is not the law Congress passed; the text begins with a specific *type* of video (prerecorded video cassette tapes) and encompasses only those audio-visual materials that closely resemble that format. *See Wojchowski v. Daines*, 498 F.3d 99, 108 n.8 (2d Cir. 2007) (where "general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words" (citation omitted)).

The VPPA's legislative history affirms that Congress intended "similar audio visual materials" to cover other means of presenting films like the ones Judge Bork rented. In recommending the VPPA's passage, the Senate Committee on the Judiciary explained that "laser discs, open-reel movies, and CDI technologies" were "similar audio visual materials" to prerecorded video cassette tapes. *See* S. Rep. No. 100-599 (1988), at 12; *see also id.* at 1–4 (expressing concern with privacy of what users "watch on television" or their "choice of [] films"). As these examples show, Congress intended the VPPA to cover different delivery methods or formats similar to the movies rented by Judge Bork, not entirely different content categories, like

news articles with short, ancillary video clips.

The VPPA is narrowly drawn to protect one's privacy in the movies one watches at home, and it accounted for technological advances in how those movies might be delivered. This is consistent with courts' interpretation of the VPPA in the streaming movie context. In *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2012 WL 3282960, at *4–6 (N.D. Cal. Aug. 10, 2012) ("*Hulu I*"), the court found that the VPPA covered streaming movie content because "similar audio visual materials" referred to the type of "video content, not about how that content was delivered." In reaching its decision, the court made clear that the "video content" itself still had to be similar to the type of content in the films Judge Bork rented. *Id.* at *5–6 ("Considering both together does not suggest—as Hulu argues—an intent to limit the [VPPA] to tangible materials but—as Plaintiffs argue—instead suggests Congress's intent to cover new technologies for pre-recorded content."); *cf. Eichenberger*, 876 F.3d at 985 ("[W]e are not persuaded that the 1988 Congress intended for the VPPA to cover circumstances so different from the ones that motivated its passage.").[27]

## III.   COUNTS 2–5 DO NOT MEET RULE 8(A)'S NOTICE PLEADING STANDARD

The Complaint's remaining counts impermissibly lump together the Defendants and inexplicably shift from People.com—the only site Plaintiff allegedly used—to "Dotdash Meredith's websites," Compl. ¶ 164 (Count 2), Defendants' "commercial websites," *id.* ¶¶ 168, 170 (Count 3), and for Counts 4 and 5, all of the above, *id.* ¶¶ 171–81. To the extent Plaintiff seeks to impose liability on any Defendant besides Dotdash Meredith, or for any website other than

---

[27] Plaintiff irrelevantly asserts that a "companion site[]" to People.com—PeopleTV.com—is solely dedicated to "the distribution of video content." Compl. ¶ 61. First, PeopleTV.com is a distinct website from People.com, as is self-evident from their different URLs. *Id.* (alleging that People.TV is "also owned and operated by Meredith Dotdash" [sic]). Second, whether one entity in a corporate structure is a video service provider has no bearing on whether another entity is. *See Nickelodeon I*, 2014 WL 3012873, at *8. Third, Plaintiff only alleges he watched video clips on People.com, not PeopleTV.com. Compl. ¶ 13 ("Mr. Martin frequently watches videos on the People.com website"). Fourth, Plaintiff offers *ipse dixit*, not well-pleaded allegations, that PeopleTV.com discloses PII. *Id.* ¶ 61.

People.com, Counts 2–5 fail to satisfy Rule 8(a) and must be dismissed.

As this Court has noted, "the essential purpose of Rule 8(a)'s pleading requirements is to 'give the defendants fair notice of what the claim is and the grounds upon which it rests.'" *Watkins v. Smith*, No. 12 Civ. 4635 (DLC), 2013 WL 655085, at *9 (S.D.N.Y. Feb. 22, 2013) (quoting *Twombly*, 550 U.S. 544, 555). Where, as here, "a plaintiff utilizes a generalized term like 'defendants' to obfuscate each defendant's role in the alleged conduct or the legal theory on which he is relying," this essential purpose "is undermined." *Id.* (imposing Rule 11 sanctions against plaintiff's counsel for filing an amended complaint with factual allegations "utterly lacking in evidentiary support" against multiple defendants).

These deficiently pled claims about "Dotdash Meredith's websites," Defendants' "commercial websites," or all of these websites, are particularly inappropriate where Plaintiff alleges that "Dotdash Meredith has continued the operations of Meredith's 39 (or more) websites and applications," Compl. ¶ 51, and IAC "own[s] brands in over 100 countries," *id.* ¶ 29. Rule 8 "places the burden squarely upon" Plaintiff to succinctly state his claims, and Defendants do not have a duty to "sift through the [c]omplaint and guess which factual allegations support which claims." *Infanti v. Scharpf*, No. 06 CV 6552 (ILG), 2008 WL 2397607, at *2 (E.D.N.Y. Jun. 10, 2008) (citation omitted). The Court should dismiss Counts 2–5 on this ground alone.

## IV. PLAINTIFF FAILS TO PLEAD A VIOLATION OF SECTION 1799.3

To the extent Plaintiff asserts his § 1799.3 claim against Dotdash Meredith for its operation of People.com, the claim fails for the same reasons as the VPPA claim. *Cf. Mollett v. Netflix, Inc.*, 795 F.3d 1062, 1067 (9th Cir. 2015) ("For the same reasons that Plaintiffs fail to plead a violation of the VPPA, Plaintiffs also fail to plead a violation of California Civil Code § 1799.3."). As a threshold matter, § 1799.3 is even narrower than the VPPA. It provides that "[n]o person providing video recording sales or rental services shall disclose any personal information or the contents of

any record, including sales or rental information . . . to any person, other than the individual who is the subject of the record, without the written consent of that individual." Cal. Civ. Code § 1799.3(a). Only "willful" violations can result in civil penalties. *Id.* § 1799.3(c). Plaintiff fails to state a claim under § 1799.3 because he does not sufficiently allege that: (a) People.com provides "video recording sales or rental services," (b) Dotdash Meredith disclosed "personal information," or (c) any such disclosure, if it occurred (it did not), was "willful." *See* Compl. ¶¶ 162–66.

First, the use of the words "sales" and "rental" means § 1799.3 only applies where a person has paid for video recordings. *See People v. King*, 38 Cal. 4th 617, 622 (2006) (statutory interpretation begins with "plain, commonsense meaning of a statute's words"). "Sale" is defined as "[t]he exchange of goods or services for an amount of money or its equivalent." *Sale,* The American Heritage Dictionary (5th ed. 2019). "Rent" means "[t]o obtain occupancy or use of (another's property) in return for regular payments." *Id.* (defining "rent"). Therefore, the statute covers only an entity offering video recordings for an exchange of value, and only the disclosure of information about videos a person bought or rented. As courts have held in interpreting similar state VPPA analogues, an entity cannot disclose "purchase" or "rental" information if it provides free services. *See, e.g.*, *In re Certified Question from the U.S. Ct. of Appeals for the 9th Cir. (Deacon v. Pandora Media, Inc.)*, 885 N.W.2d 628, 629–32 (Mich. 2016) (disclosure of information sufficient to identify the plaintiff and the ***free*** streaming music he had listened to did not violate Michigan's VPPA analogue, which was limited to persons who "purchase[], rent[] or borrow[] . . . a sound record"). People.com is free, and Plaintiff "never paid for a People.com subscription." Compl. ¶ 13. Plaintiff fails to state a § 1799.3 claim on this ground alone.

Second, Plaintiff fails to allege that People.com discloses "personal information." Section 1799 does not define "personal information," nor has any court offered its interpretation. In

applying other California privacy statutes where "personal information" is undefined, California courts "reason by analogy to federal statute." *Moghadam v. Regents of Univ. of Cal.*, 169 Cal. App. 4th 466, 483–84 (2008) (interpreting "personal information" in § 1798.3). It follows that Plaintiff's failure to allege the disclosure of PII under the VPPA likewise constitutes a failure to allege the disclosure of "personal information" under § 1799.3.

Third, Plaintiff offers no well-pleaded allegation to support the assertion that Defendants "willful[ly]" violated § 1799.3, Compl. ¶ 165. *See, e.g.*, *Mollett v. Netflix, Inc.*, No. 12-17045, 2012 WL 3731542, at *4 (N.D. Cal. Aug. 17, 2012) (granting motion to dismiss § 1799.3 claim for failure to plead willful violation, and noting "[n]either the VPPA nor § 1799.3 is a strict liability statute"). Plaintiff's failure to sufficiently allege a knowing disclosure of PII under the VPPA similarly dooms his § 1799.3 claim.

## V.  PLAINTIFF FAILS TO PLEAD AN OPPA VIOLATION

Count 3 alleges a violation of the OPPA, Cal. Bus. & Prof. Code § 22575, which requires "an operator of a commercial Web site or online service that collects personally identifiable information through the Internet about individual consumers residing in California who use or visit its commercial Web site or online service [to] conspicuously post its privacy policy on its Web site[.]" This claim fails at the outset because "the OPPA itself does not provide for a private action or public prosecution for any violation of its provisions." *People ex rel. Harris v. Delta Air Lines, Inc.*, 247 Cal. App. 4th 884, 891 (2016); *see also In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318 at *43 (N.D. Cal. Aug. 30, 2017) (dismissing plaintiffs' OPPA claim with prejudice because "Plaintiffs lack a private right of action under the OPPA," and amendment would therefore be futile).

Nor can Plaintiff bootstrap the OPPA to assert a different legal theory (for instance, as a predicate "unlawful" act under the UCL, *e.g.*, Compl. ¶ 173). The Complaint asserts a violation of

31

the OPPA's conspicuous privacy policy requirement. However, "a website operator only violates this subdivision if it fails to post its policy within 30 days after being notified of noncompliance." Cal Bus. & Prof. Code § 22575(a). Plaintiff does not allege that any Defendant was "notified of noncompliance," nor allege which Defendant failed to post a privacy policy, let alone the website at issue. To the extent Plaintiff intends to assert a violation of § 22576—which requires the privacy policy to contain certain categories of information—he neither cites this provision nor alleges Defendants "knowingly and willfully" or "negligently and materially" failed to comply, as § 22576 requires. The Court should dismiss Count 3 for these independent reasons.

## VI.   PLAINTIFF FAILS TO PLEAD A UCL CLAIM

The UCL claim fails because Plaintiff has not alleged the required "economic injury": lost money or property. *Kwikset Corp. v. Super. Ct.*, 51 Cal. 4th 310, 322 (2011). "[I]f [a plaintiff] cannot allege both that [he] suffered injury in fact *and* that [he] lost money or property as a result of an unlawful, unfair, or fraudulent business practice, then [he] lack[s] statutory standing to sue under the UCL." *Cappello v. Walmart Inc.*, No. 18-cv-06678-RS, 2019 WL 11687705, at *4 (N.D. Cal. Apr. 5, 2019). The economic injury requirement is inherently "'more restrictive than federal injury in fact' because it encompasses fewer kinds of injuries." *Van Patten v. Vertical Fitness Grp., LLC*, 847 F.3d 1037, 1048–49 (9th Cir. 2017) (citation omitted).

The only allegedly "unlawful[]" and "unfair" conduct at issue is the purported disclosure of Plaintiff's "personally identifiable information and video-viewing history." Compl. ¶¶ 173–74. Courts have consistently determined that this type of disclosure does not amount to an economic injury for purposes of UCL standing. *Cappello*, 2019 WL 11687705, at *4 (citing, *e.g.*, *Svenson v. Google Inc.*, 65 F. Supp. 3d 717, 730 (N.D. Cal. 2014); *In re iPhone Application Litig.*, No. 11-MD-02250-LHK, 2011 WL 4403963, at *14 (N.D. Cal. Sept. 20, 2011); *In re Google Inc. St. View Elec. Commc'ns Litig.*, 794 F. Supp. 2d 1067, 1086 & n.14 (N.D. Cal. 2011); *Ruiz v. Gap, Inc.*,

540 F. Supp. 2d 1121, 1127 (N.D. Cal. 2008), *aff'd*, 380 F. App'x 689, 692 (9th Cir. 2010)).[28]

In *Cappello*, for example, the plaintiffs alleged that Walmart had disclosed their Facebook ID and a product ID revealing to Facebook the particular DVDs and Blu-Rays they had purchased. 2019 WL 11687705, at *1. Like here, the plaintiffs asserted this conduct violated the VPPA and § 1799.3 and contended this "unlawful" behavior was the basis for a UCL claim. *Id.* The Northern District of California dismissed the UCL claim, holding that a plaintiff "must allege more than a loss of personal information to establish standing under the UCL." *Id.* at *4. Plaintiff's nearly identical UCL claim here requires dismissal for the same reason.[29]

## VII.  PLAINTIFF FAILS TO PLEAD A CLAIM UNDER N.Y. GENERAL BUSINESS LAW

GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in [New York]." To state a GBL § 349 claim, a plaintiff must allege: "(1) that a defendant has engaged in consumer-oriented conduct; (2) that is materially misleading; and (3) that the plaintiff has suffered injury as a result of this misconduct."

---

[28] Moreover, Plaintiff does not sufficiently allege any "unlawful" or "unfair" conduct and therefore fails to state a violation of the UCL. Cal. Bus. & Prof. Code § 17200 ("unfair competition" in statute encompasses "any unlawful, unfair, or fraudulent business act or practice"); *see also* Compl. ¶¶ 174–75 (alleging "unlawful" and "unfair" practices). Plaintiff's theory of "unlawful" conduct simply bootstraps off his statutory claims, *id.* ¶ 173, and because those statutory claims fail for the reasons explained above, so too does his UCL claim. *See Ingels v. Westwood One Broad. Servs., Inc.*, 129 Cal. App. 4th 1050, 1060 (2005) ("A defendant cannot be liable under [Section] 17200 for committing unlawful business practices without having violated another law.") (internal quotation and citation omitted). As for Plaintiff's theory of "unfair" conduct, assertions of "immoral, unethical, oppressive, [and] unscrupulous" conduct, Compl. ¶ 174, are "mere labels and conclusions" that are "not sufficient to plead a claim under the 'unfair' prong of the UCL" or sufficient to "survive a motion under Rule 12(b)(6)." *BHRS Grp., LLC v. Brio Water Tech., Inc.*, 553 F. Supp. 3d 793, 802 & n.27 (C.D. Cal. 2021). Additionally, "for a party to bring equitable relief claims under the UCL . . . , [it] must sufficiently allege a lack of legal remedy in order to survive a motion to dismiss." *Barrett v. Apple Inc.*, 523 F. Supp. 3d 1132, 1157 (N.D. Cal. 2021) (dismissing UCL claim with prejudice) (citing *Sonner v. Premier Nutrition Corp.*, 971 F.3d 834, 844 (9th Cir. 2020)). Plaintiff does not bother to allege (conclusorily or otherwise) that he lacks a legal remedy (Compl. ¶¶ 171–74), and indeed, he seeks damages as to his other causes of action (*id.*, Prayer for Relief); the UCL must be dismissed on this ground as well.

[29] Plaintiff also lacks UCL standing because he fails to plead causation. *See Kwikset*, 51 Cal. 4th at 322 ("economic injury" must be "the result of, i.e., caused by, the unfair business practice"). The allegation that a defendant failed to comply with "the VPPA and section 1799.3" does not plead that plaintiff "relied on any misrepresentation" by the defendant, and "would not have paid or would have paid less for the products" at issue. *Cappello*, 2019 WL 11687705, at *4. This is particularly so because Plaintiff "never paid for a People.com subscription." Compl. ¶¶ 13, 65–81.

*Shostack v. Diller*, No. 15 Civ. 2255 (GBD), 2016 WL 958687, at *4 (S.D.N.Y. Mar. 8, 2016). In addition, "the transaction in which the consumer is [allegedly] deceived must occur in New York." *Kaufman v. SiriusXM Radio, Inc.*, 751 F. Supp. 2d 681 (S.D.N.Y. 2010).

Plaintiff's GBL claim fails for several reasons. First, his assertion of "materially misleading" conduct simply references "the acts and conduct of Defendants," Compl. ¶ 177, which fails the basic notice pleading standard. Second, Plaintiff does not allege the type of injury cognizable as a GBL § 349 claim. The Complaint repeats the legal conclusion that Plaintiff and putative class members suffered an invasion of privacy, loss of control over their information, and emotional distress. *Id*. ¶¶ 133–37. Merely pleading an "unquantifiable injury to a privacy interest"—as Plaintiff does here—"is not a cognizable [GBL § 349] injury." *Shostack*, 2016 WL 958687, at *5 (dismissing claim where plaintiff received telemarketing calls after a third party stole his personal information); *see also Cohen v. Casper Sleep Inc.*, No. 17 Civ. 9325 (WHP), 2018 WL 3392877, at *7 (S.D.N.Y. Jul. 12, 2018) (allegations of "a general invasion of privacy" do not meet GBL § 349's injury requirement). Plaintiff's failure to provide any factual support for the allegation that he (or any putative class member) suffered a cognizable injury is cause for dismissal. *See Smith v. Chase Manhattan Bank, USA, N.A.*, 293 A.D.2d 598, 599–600 (N.Y. App. Div. 2002) (dismissing GBL § 349 claim where plaintiff "d[id] not allege a single instance where a named plaintiff or any class member suffered any actual harm due to the receipt of an unwanted telephone solicitation or a piece of junk mail" as a result of their information being sold to third-party marketers); *Cherny v. Emigrant Bank*, 604 F. Supp. 2d 605, 608 (S.D.N.Y. 2009) ("[T]he release of potentially sensitive information alone, without evidence of misuse, is insufficient to cause damage to a plaintiff.").

Third, "[GBL] § 349 injury has been recognized only where confidential, individually

identifiable information—such as medical records or a Social Security number—is collected without the individual's knowledge or consent." *Mount v. PulsePoint, Inc.*, 684 F. App'x 32, 35 (2d Cir. 2017)*, as amended* (May 3, 2017). Online viewing habits are not akin to medical records or a Social Security number. *Id.* Nor, as demonstrated above, was the sort of "confidential, individually identifiable information" that GBL § 349 protects actually collected or disclosed here. *Id.*

Finally, the GBL claim is defective because Plaintiff, a California resident, fails to allege that any deceptive conduct occurred in New York. Plaintiff merely claims that certain defendants are "located in New York," Compl. ¶ 178, and "caused Class Members' personally identifiable information to be collected and disclosed . . . from . . . New York." *Id*. This is not enough to state a § 349 claim. *See SimplexGrinnell LLP v. Integrated Sys. & Power, Inc.*, 642 F. Supp. 2d 167, 203 n.19 (S.D.N.Y. 2009) ("The reach of [GBL § 349] is explicitly limited to the deception of consumers occurring in New York. It is not sufficient that a marketing plan originates in New York if the consumer deception occurs elsewhere. The [allegedly-deceptive] statement . . . was sent to a potential customer in New Jersey and is thus outside the bailiwick of the New York statute." (citations omitted))

The GBL claim should be dismissed.

## CONCLUSION

For all the foregoing reasons, the Court should dismiss the Complaint in its entirety.

Dated: September 16, 2022

Respectfully submitted,

Meredith Corporation, Meredith Holdings Corporation, IAC/InterActiveCorp, Dotdash Media, Inc., and Dotdash Meredith, Inc.

By Its Attorneys,

*/s/ Tiana Demas*
Tiana Demas
COOLEY LLP
55 Hudson Yards, 43rd Floor
New York, NY 10001
Telephone:     +1 212 479 6000
Facsimile:      +1 212 479 6275
tdemas@cooley.com

David E. Mills (*pro hac vice*)
Alexander J. Kasner (*pro hac vice*)
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2400
Telephone:     +1 202 842 7800
Facsimile:      +1 202 842 7899
dmills@cooley.com
akasner@cooley.com

Kyle C. Wong
COOLEY LLP
3 Embarcadero Center, 20th Floor
San Francisco, CA 94111-4004
Telephone:     +1 415 693-2029
Facsimile:      +1 415 693-2222
kwong@cooley.com

## <u>CERTIFICATE OF SERVICE</u>

IT IS HEREBY CERTIFIED that, on this 16th day of September 2022, this document, filed through the CM/ECF system, will be served electronically to the registered participants on the Notice of Electronic Filing and paper copies will be sent to any non-registered participants.


*/s/ Tiana Demas*
Tiana Demas