**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| WILLIAM J. MARTIN, individually and on behalf of all others similarly situated,<br><br>     Plaintiffs,<br><br>  v.<br><br>MEREDITH CORPORATION, MEREDITH HOLDINGS CORPORATION, IAC/INTERACTIVECORP, DOTDASH MEDIA, INC., DOTDASH MEREDITH, INC.,<br><br>     Defendants. | No. 22-cv-4776 (DLC) |

**PLAINTIFF'S MEMORANDUM OF LAW IN**
**OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

*Of Counsel*:
Eric M. George, Esq.
Carl A. Roth, Esq. (*pro hac vice* forthcoming)
Ryan Q. Keech, Esq. (*pro hac vice* forthcoming)
Stefan Bogdanovich, Esq. (admitted *pro hac vice*)

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
*Attorneys for Plaintiff*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ......................................................................................... iii

I.    PRELIMINARY STATEMENT ........................................................................1

II.   STATEMENT OF FACTS ................................................................................3

     A.    The Parties ..............................................................................................4

     B.    People.com and PeopleTV.com ..............................................................5

     C.    Facebook Pixel ........................................................................................7

III.  LEGAL STANDARD ON A MOTION TO DISMISS .....................................9

IV.   PLAINTIFF HAS STANDING TO BRING SUIT ..........................................10

V.    DEFENDANTS' REMAINING ARGUMENTS FAIL .....................................12

     A.    Mr. Martin Properly Alleges a Violation of the VPPA .........................12

          1.    Defendants Disclosed Personally Identifiable Information ......13

               a.    Defendants Disclosed the Identity of Individuals .........13

               b.    Defendants Disclosed Video Titles and URLs to Facebook ..........14

               c.    Mr. Martin "Requested or Obtained" Videos By Visiting the Pages Hosting Them ..............................17

          2.    Defendants Knowingly Transmitted Personally Identifiable Information ...............................................................................18

          3.    Defendants and People.com Are Video Tape Service Providers ...............20

     B.    Defendants' Rule 8(a) Arguments Fail ..................................................24

     C.    Mr. Martin Has Properly Pled New York And California State Claims ..............26

          1.    Mr. Martin Pled a Violation of California Civil Code § 1799.3 ...............26

          2.    Mr. Martin Properly Pled that Defendants Knowingly and Willfully Violated the OPPA ..............................................28

          3.    Mr. Martin Properly Pled a Violation of the UCL ....................29

**TABLE OF CONTENTS**
**(Continued)**

**Page**

4.    Defendants' N.Y. General Business Law Arguments Fail .......................31

VI.    CONCLUSION ..................................................................................................33

## TABLE OF AUTHORITIES

**Page(s)**

**FEDERAL CASES**

*Allen v. Credit Suisse Sec. (USA) LLC,*
   895 F.3d 214 (2d Cir. 2018).................................................................................9

*Amazon.com LLC v. Lay,*
   758 F. Supp. 2d 1154 (W.D. Wash. 2010).............................................................22

*Ambrose v. Bos. Globe Media Partners LLC,*
   CV 21-10810-RGS, 2022 WL 4329373 (D. Mass. Sept. 19, 2022) .....................13, 14, 22, 23

*Amidax Trading Grp. v. S.W.I.F.T. SCRL,*
   671 F.3d 140 (2d Cir. 2011)..................................................................................12

*Atari Games Corp. v. Oman,*
   888 F.2d 878 (D.C. Cir. 1989)..............................................................................24

*Austin-Spearman v. AMC Networks, Inc.,*
   98 F. Supp. 3d 662 (S.D.N.Y. 2015)..................................................................1, 14

*Azeez v. Ramaiah,*
   No. 14-cv-5623 (PAE), 2015 WL 1637871 (S.D.N.Y. Apr. 9, 2015) ....................12

*Bell Atl. Corp. v. Twombly,*
   550 U.S. 544 (2007).............................................................................................10

*Bernardino v. Barnes & Noble Booksellers, Inc.,*
   No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230 (S.D.N.Y. Aug. 11, 2017) ...........14, 20

*Cappello v. Walmart Inc.,*
   394 F. Supp. 3d 1015 (N.D. Cal. 2019) ...........................................................25, 30

*Cappello v. Walmart Inc.,*
   No. 18-cv-06678-RS, 2019 WL 11687705 (N.D. Cal. Apr. 5, 2019)...........................4, 15, 30

*Carter v. HealthPort Tech., LLC,*
   822 F.3d 47 (2d. Cir. 2016)..............................................................................10, 12

*Chambers v. Time Warner, Inc.,*
   282 F.3d 147 (2d Cir. 2002)...................................................................................9

*Cottle v. Plaid Inc.,*
   536 F. Supp. 3d 461 (N.D. Cal. 2021) ...................................................................16

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

*Curtis v. Cenlar FSB*,
    No. 13-cv-3007 (DLC), 2013 WL 5995582 (S.D.N.Y. Nov. 12, 2013) ...........................10, 11

*United States ex rel. Daugherty v. Tiversa Holding Corp.*,
    342 F. Supp. 3d 418 (S.D.N.Y. 2018) ..........................................................................9, 10, 12

*Eichenberger v. ESPN, Inc.*,
    876 F.3d 979 (9th Cir. 2017) ...................................................................................13, 14, 16

*Empire Merchants, LLC v. Reliable Churchill LLLP*,
    902 F.3d 132 (2d Cir. 2018)........................................................................................15

*FTC v. Amazon.com, Inc.*
    No. C14-1038-JCC, 2015 WL 11256312 (W.D.Wash. Aug. 3, 2015)...................................16

*Iconix Brand Grp., Inc. v. Bongo Apparel, Inc.*,
    No. 06-cv-8195 (DLC), 2008 WL 2695090 (S.D.N.Y. July 8, 2008) ..............................24, 25

*In re Facebook, Inc., Consumer Priv. User Profile Litig.*,
    402 F. Supp. 3d 767 (N.D. Cal. 2019) ...............................................................................20, 22

*In re Facebook, Inc. Internet Tracking Litig.*,
    956 F.3d 589 (9th Cir. 2020) .............................................................................................7

*In re Facebook Internet Tracking Litig.*,
    140 F. Supp. 3d 922 (N.D. Cal. 2015) ..................................................................................14

*In re Facebook Priv. Litig.*,
    572 F. App'x 494 (9th Cir. 2014).....................................................................................22, 26

*In re Hulu Priv. Litig.*,
    No. C 11-03764 LB, 2014 WL 1724344 (N.D. Cal. Apr. 28, 2014) ...........................13, 19, 20

*In re Hulu Privacy Litig.*,
    86 F. Supp. 3d 1090 .........................................................................................................14, 19

*In re Hulu Privacy Litig.*,
    No. C 11-03764 LB, 2012 WL 3282960 (N.D. Cal. Aug. 10, 2012) .....................................23

*In re Nickelodeon Consumer Priv. Litig.*,
    2014 WL 3012873 (D.N.J. July 2, 2014)................................................................................13

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*In re Nickelodeon Consumer Privacy Litig.*,
  827 F.3d 264 (3rd Cir. 2016) .................................................13

*In re TikTok, Inc., Consumer Priv. Litig.*,
  565 F. Supp. 3d 1076 (N.D. Ill. 2021) .................................................23

*In re Vizio Inc., Consumer Priv. Litig.*,
  238 F. Supp. 3d 1204 (C.D. Cal. 2017) .........................................11, 20

*In re Yahoo! Inc. Customer Data Sec. Breach Litig.*,
  No. 16-MD-02752-LHK, 2017 WL 3727318 (N.D. Cal. Aug 30, 2017)...................28, 30, 31

*In re Zynga Priv. Litig.*,
  750 F.3d 1098 (9th Cir. 2014) .................................................14

*Leadsinger, Inc. v. BMG Music Pub.*,
  512 F.3d 522 (9th Cir. 2008) .................................................24

*Louth v. NFL Enterprises LLC*,
  No. 1:21-cv-00405-MSM-PAS, 2022 WL 4130866 (D.R.I.) ......................................... *passim*

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992).................................................10

*McDonald v. Kiloo ApS*,
  385 F. Supp. 3d 1022 (N.D. Cal. 2019) .................................................32

*Mollett v. Netflix, Inc.*,
  No. 5:11–CV–01629–EJD, 2012 WL 3731542 (N.D. Cal. Aug. 17, 2012), *aff'd*,
  795 F.3d 1062 (9th Cir. 2015) .................................................27

*Mount v. Pulsepoint, Inc*,
  684 F. App'x 32 (2d Cir. 2017) *as amended* (May 3, 2017) .................................................32

*Nicosia v. Amazon.com Inc.*,
  834 F.3d 220 (2d Cir. 2016).................................................9

*Robinson v. Disney Online*,
  152 F. Supp. 3d 176 (S.D.N.Y. 2015).................................................13

*Roth v. Jennings*,
  489 F.3d 499 (2d Cir. 2007).................................................9, 16

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Rubio v. Capital One Bank*,
    613 F.3d 1195 (9th Cir. 2010) ..................................................................29

*Safeco Ins. Co. of Am. v. Burr*,
    551 U.S. 47 (2007)...................................................................................27

*Stanley v. Georgia*,
    394 U.S. 557 (1969).................................................................................10

*Stark v. Patreon, Inc.*,
    No. 22-cv-03131-JCS, 2022 WL 7652166 (N.D. Cal. Oct. 13, 2022) ...................14

*TransUnion LLC v. Ramirez*,
    141 S. Ct. 2190 (2021)........................................................................1, 11

*United States v. Shultz*,
    No. 16-10107-01-EFM, 2018 WL 534333 (D. Kan. Jan. 24, 2018)......................22

*Ward v. TheLadders.com, Inc.*,
    3 F. Supp. 3d 151 (S.D.N.Y. 2014) ........................................................32, 33

*Yershov v. Gannett Satellite Info. Network, Inc.*,
    820 F.3d 482 (1st Cir. 2016)............................................................13, 16, 22

**NEW YORK STATE CASES**

*Goshen v. Mut. Life Ins. Co. of N.Y.*,
    98 N.Y.2d 314 (2002) ..............................................................................33

**CALIFORNIA STATE CASES**

*Bardin v. DaimlerChrysler Corp.*,
    136 Cal. App. 4th 1255 (2006) ...................................................................30

*People ex rel. Harris v. Delta Air Lines, Inc.*,
    247 Cal. App. 4th 884 (2016) ....................................................................28

*Mabry v. Superior Ct.*,
    185 Cal. App. 4th 208 (2010) ....................................................................28

*Moradi-Shalal v. Fireman's Fund Ins. Companies*,
    46 Cal. 3d 287 (1988) ..............................................................................28

# TABLE OF AUTHORITIES
## (continued)

**Page(s)**

## OTHER STATE CASES

*In re Certified Question from United States Ct. of Appeals for Ninth Cir. (Deacon v.
    Pandora Media, Inc.)*,
    499 Mich. 477 (2016) ...........................................................................................26, 27

## FEDERAL STATUTES

17 U.S.C. § 101 .................................................................................................................24

Video Privacy Protection Act (VPPA)
    18 U.S.C. § 2710 ................................................................................. *passim*

## STATE STATUTES

Cal. Bus. & Prof. Code
    § 17200 .....................................................................................................................29
    § 22576 ..........................................................................................................29, 30, 31
    § 22578 .....................................................................................................................29

Cal. Civ. Code
    § 1799.3 .................................................................................................. *passim*
    § 1799.3(a) ...............................................................................................................26
    § 1799.3(c) ..........................................................................................................26, 27

New York General Business Law (GBL) ..........................................................3, 24, 31
    § 349 ............................................................................................................1, 31, 32
    § 672 .......................................................................................................................3, 32

## RULES

Federal Rules of Civil Procedure
    Rule 8(a)(2) .............................................................................................................24
    Rule 10(c) ................................................................................................................24
    Rule 12(b) ..................................................................................................................9
    Rule 12(b)(1) ......................................................................................................10, 12
    Rule 12(b)(1) ......................................................................................................10, 11
    Rule 12(b)(6) ........................................................................................... *passim*

## OTHER AUTHORITIES

1 Nimmer on Copyright § 2.09[B] (2022) .....................................................................24

**TABLE OF AUTHORITIES**
**(continued)**

**Page(s)**

The Boston Globe ................................................................................................22, 23

131 Harv. L. Rev. 1766 (2018) .........................................................................23

*Hearing Before the Subcomm. on Privacy, Tech. & the Law of the S. Comm. on the Judiciary,* 112th ........................................................................................23

## I.    **PRELIMINARY STATEMENT**

On behalf of a nationwide class of registered users of Defendants' video service, Plaintiff William J. Martin ("Plaintiff") has plausibly pleaded that Defendants disclosed, without consent, highly sensitive, private information about users of their websites, including the titles of videos those users watched, to Facebook.  These disclosures constitute violations of the Video Privacy Protection Act 18 U.S.C. § 2710 ("VPPA"), Cal. Civ. Code § 1799.3 ("Cal. 1799.3"), California's Online Privacy Protection Act ("OPPA"), California's Unfair Competition Law ("UCL") and New York General Business Law ("GBL") § 349.  Defendants acknowledge the basic facts of their illegal conduct, but ask this Court to dismiss the action and absolve them from liability.  Their motion is flawed and should be denied.

*First*, Defendants argue that Plaintiff lacks standing.  Memorandum of Law In Support of Defendants' Motion to Dismiss (ECF 37) ("Mot.") at 9.  According to them, the Complaint does not allege an injury-in-fact.  *Id.*  But this is flatly untrue.  The law in this Circuit and others establishes that disclosure of private information constitutes an injury-in-fact for purposes of Article III standing.  *Austin-Spearman v. AMC Networks, Inc.*, 98 F. Supp. 3d, 662, 666 (S.D.N.Y. 2015) (collecting cases); *TransUnion LLC v. Ramirez,* 141 S. Ct. 2190, 2204 (2021). This is precisely what Plaintiff alleged: Defendants disclosed private information, including the names of videos Mr. Martin and other users requested or obtained through Defendants' websites. In the guise of a standing argument, Defendants improperly attempt to introduce extrinsic evidence raising contested matters of fact.  This is an improper end-run around Rule 12(b)(6), and the Court should reject it as it has rejected similar attempts to introduce extrinsic evidence on a motion to dismiss.

*Second*, Defendants argue that the information they disclosed is insufficient to give rise to a cause of action under the VPPA.  Mot. at 13.  But Plaintiff alleged that Defendants disclosed to Facebook information that identifies a person as having requested or obtained specific video materials; these disclosures suffice for a VPPA claim.  Thus, Defendants identify specific persons to Facebook by sending their Facebook User IDs ("Facebook ID") and identify specific video materials to Facebook by disclosing the titles of those videos and the URLs of the webpages where those videos are hosted.  Defendants misstate the statute as requiring that the disclosure include whether the person *watched* the video; the statute merely requires that the disclosure include videos "requested or obtained" by the person.  Mot. at 18; 18 U.S.C. § 2710.

*Third*, Defendants argue that Mr. Martin failed to allege that Defendants' disclosures were knowingly made to Facebook.  Mot. at 22.  This, too, misses the mark: Plaintiffs alleged that Defendants knowingly installed and configured the Facebook Pixel, code created to track the activities of users on Defendants' websites and transmit information about those activities to Facebook.  To the extent Defendants disagree with these allegations, the place for them to test the truth of these allegations is at the merits stage of the case.

*Fourth*, Defendants argue that the VPPA does not apply to them because they are not video tape service providers.  Mot. at 24.  But the VPPA defines video tape services providers as anyone engaged in the "rental, sale, or delivery" of audio visual materials.  18 U.S.C. § 2710.  Defendants' websites are engaged in the business of delivering videos to their users.

*Fifth*, Defendants argue that the Complaint does not give Defendants fair notice of Mr. Martin's claims.  But the Complaint clearly identifies the websites that allegedly disclosed personal information, and the relationship of each Defendant to those websites.

*Finally*, Defendants argue that each of the alleged state claims are deficient. Contrary to Defendants' arguments, California Civil Code § 1799.3 applies to Defendants even though their websites are "free" because Defendants are in the business of streaming video content to their users to generate a profit. While Defendants argue that the OPPA does not have an explicit private right of action, there is sufficient justification to find an implied right of action, and the Complaint stated a claim pursuant to that implied right. Defendants' arguments that Mr. Martin lacks standing to assert a claim under the UCL are flawed; Mr. Martin has standing to assert a UCL claim predicated on Defendants' violations of the VPPA, Cal. § 1799.3, and the OPPA. Finally, the Complaint alleged a cognizable injury under the GBL: disclosure of private information. This is the same cognizable injury that Congress, the California Legislature, and the New York Legislature sought to protect against by passing the VPPA, Cal. § 1799.3, the OPPA, and New York's VCPA (GBL § 672).

For all of these reasons, detailed further below, the Court should deny Defendants' motion to dismiss.

## II.    <u>STATEMENT OF FACTS</u>

This class action lawsuit seeks redress for Dotdash Meredith's knowing, unlawful sharing of highly sensitive personal information. Compl. ¶ 6. "Every time a [putative class member] views video content on People.com, Dotdash Meredith causes the identity of the viewer and the titles of the videos viewed to be shared with Facebook" via a code called the Facebook Pixel. *Id*. ¶ 3. Dotdash Meredith does not disclose this fact to the class members. *Id*. Class members are individuals who created accounts with People.com[1] ("Registered Users") who had a Facebook

---

[1] Shortly after this lawsuit was filed, the People.com website was altered to remove all People.com accounts. *See* Declaration of Junsu Choi, at n. 1. ECF 39.

account and had their video consumption information and identities disclosed to Facebook.com. *Id*. ¶¶ 66, 139.

Dotdash Meredith neither requests nor obtains informed written consent from Registered Users to share their video viewing history in a distinct and separate form as required by the VPPA[2], and does not offer Visitors or Registered Users of People.com the ability to opt in to sharing personally identifiable information. *Id*. ¶¶ 80, 81. In fact, "[a]t no point in the registration process are Registered Users [of People.com] required to consent to *any* Dotdash Meredith policies." *Id*. ¶ 78.

A.    **The Parties**

"Mr. Martin has been an active subscriber of People.com since at least November 2020, and he watches videos on their website daily" from his California residence, including those relating to "politics, travel, and new movie/music releases." *Id*. ¶13.

Defendant Dotdash Meredith, Inc. "owns and continues to operate the business units relevant to this class action," including People.com and PeopleTV.com. *Id*. ¶¶ 21, 52, 61. It is "one of the ten largest internet companies by audience in the world." *Id*. ¶ 46. It is a wholly owned subsidiary of the media conglomerate Defendant IAC/InterActiveCorp ("IAC"). *Id*. ¶¶ 29, 30. On October 6, 2021, Defendant Meredith Corporation (and its wholly owned subsidiary, Meredith Holdings Corporation) agreed to merge with IAC. *Id*. ¶¶ 15, 20. Dotdash Meredith was created as a result of this merger. *Id*. ¶ 30. Before the merger, Meredith Corporation and Meredith Holdings Company (collectively, the "Legacy Meredith entities") operated at least 39

---

[2] As another Court explained to Defendants' counsel, compliance with the law "would [] not be burdensome"—it only requires "design[ing] a website whereby [visitors] must click a box confirming their consent to disclosures involving video [consumption] and click a separate box confirming their consent to all other applicable policies and terms." *Cappello v. Walmart Inc*., No. 18-cv-06678-RS, 2019 WL 11687705, at *2 (N.D. Cal. Apr. 5, 2019).

websites and applications, including People.com and PeopleTV.com. *Id*. ¶¶ 31-32. The Legacy Meredith entities call PEOPLE their "flagship" and their "crown jewel." *Id*. ¶ 53.

Defendants emphasize to shareholders the importance of online videos to Defendants' bottom line. For example, Meredith Corporation told its investors it "recorded 5 billion video views on its platforms" last year and that it was only just getting started: "in reference to the merger with Dotdash, Meredith said that "As part of our strategy, we will accelerate investment in growing platforms such as … video to serve audiences wherever they choose to consume our content." *Id*. ¶¶ 35, 38, 47 (*quoting* 2021 Annual Report and Transcript of June 2021 Investor Update). Meredith Corporation's president and CEO added that "[c]reating more video, the market for digital video related advertising is expected to grow 30% faster than non-video display advertising, and accounts for more than half of the total digital display ad spending in 2020 according to eMarketer. We are seeing early and strong results from our video production work with video views and revenues across our owned and operated sites up in the double-digits in our fiscal second quarter." *Id*. ¶ 40. "Meredith also developed, produced, and distributed its own video content on all platforms, including online, through its Meredith Video production division, which is its digital and multi-platform video production division." *Id*. ¶ 45. Dotdash Meredith, for its part, now says it is "very interested in developing a long-form video strategy; one which really focuses on the lifetime value of the video library." *Id*. ¶ 50. Dotdash Meredith's People.com Media Kit, used to sell ads to ad-buyers, emphasizes video content on People.com. *Id*. ¶ 59.

### B.    People.com and PeopleTV.com

People.com is a popular news and media website that receives over 29 million monthly video views. *Id*. ¶¶ 54, 57. Many webpages on People.com consist entirely of videos, and they

"embed videos in different formats, from different sources."  *Id*. ¶¶ 55-56.  People.com "runs YouTube, TikTok, Twitter, Pinterest, and Instagram accounts where it promotes its videos."  *Id*. ¶ 59.

People.com links to the videos hosted on PeopleTV.com on the front page of People.com on the top header.  *See* Compl. ¶¶ 61[3], 65 (Screenshot from ¶ 65 reproduced below):



PeopleTV.com's sole purpose is the distribution of video content.  *Id*. ¶ 61. PeopleTV.com content often appears on People.com, and one of the reasons people visit People.com is to view peopleTV.com content.  *Id*.  PeopleTV.com features several shows, including hours-long episodes of *Royals* and twenty-minute long episodes of *People & Crime*.[4] A link to Royals content (including video content) also appears on the top header on the front page of People.com.  Registered Users of People.com, like Mr. Martin, can subscribe to the *Royals* newsletters to receive the latest *Royals* content.  *Id*. ¶ 67 (Screenshot reproduced below):



---

[3] *See e.g.*, https://people.com/pets/christy-carlson-romano-helps-couple-adopt-dog-celebrity-pet-matchmaker/ or https://people.com/crime/human-remains-found-brian-laundrie-search-florida-park/.

[4] *See e.g.*, https://peopletv.com/all-shows/royals/ and https://peopletv.com/all-shows/people-crime/.

### C.       **Facebook Pixel**

Dotdash Meredith uses various trackers on its websites to customize content and advertisements presented to Registered Users, like Mr. Martin.  *Id.* ¶¶ 76-77.  Facebook Pixel is one of those trackers.[5]  *Id.* ¶ 83.  The Legacy Meredith Entities originally programmed and configured the Facebook Pixel so that it discloses to Facebook, among other things, the URL of the video (which includes the name of the video appearing on the webpage viewed) and the Registered User's Facebook ID.  *Id.* ¶¶ 84-85.  "On information and belief, viewing a video on People.com and the other Dotdash Meredith websites triggers the Facebook Pixel code embedded on those websites to report the title of the video and the viewer's Facebook ID to Facebook."  *Id.* ¶ 102.

The Facebook ID is a unique number that allows anyone to look up a person's Facebook profile, which will include their profile picture and full name by typing into their web browser www.facebook.com/[Facebook ID].  *Id.* ¶¶ 88-90.  Facebook automatically associates Facebook IDs with the identity of the videos transmitted to it.  *Id.* ¶ 90.  Facebook claims that, by using its Pixel, "[w]hen someone visits your website and takes an action… the Facebook pixel is triggered and reports this action… You'll also be able to reach *this* customer again by using a custom audience."  *Id.* ¶¶ 100, 131 (emphasis added).

The Legacy Meredith entities' installation and Dotdash Meredith's use of the Facebook Pixel on People.com and PeopleTV.com was no accident.  Facebook markets the Pixel to

---

[5] Trackers are internet browser extensions that "'track users' browsing histories when they visit third-party websites, and then compiles these browsing histories into personal profiles which are sold to advertisers to generate revenue."  *In re Facebook, Inc. Internet Tracking Litig.*, 956 F.3d 589, 596 (9th Cir. 2020).

companies like Dotdash Meredith as a tool that "can tally [visitor] actions in the Facebook Ads Manager so you can use the data to analyze your website's conversion flows and optimize your ad campaigns." *Id*. ¶ 99. And Facebook markets its Pixel as allowing companies like Dotdash Meredith to identify and contact individuals that previously visited their sites like People.com and peopleTV.com. *Id*. ¶¶ 100, 131. Dotdash Meredith "brags [to prospective ad buyers] that [it] has assembled '20+ years of *first party data* and the best research, data scientists in the business' to 'identify trends, insights and activate like no other publisher.'" *Id*. ¶ 76 (emphasis added). Across all the various trackers it uses on its website, including, but not limited to, Facebook Pixel, Dotdash Meredith collects by its own admission "demographic information, location, internet activity, interests, and health and fitness information, and uses that information to customize content and advertisements that it presents to Registered Users." *Id*. ¶ 77. Upon information and belief, Dotdash Meredith has had sole control of its websites and code, re-wrote this code to install Facebook Pixel on People.com, and knowingly and willfully disclosed Registered Users' personally identifiable information. *Id*. ¶ 131.[6]

---

[6] Even Defendants' own, improperly-submitted evidence corroborates these facts: the declaration of Junsu Choi confirms that *every time the tester visited a single people.com webpage containing an embedded video, four pages of data was disclosed to Facebook* through GET and POST requests. Choi Decl., ¶¶ 3-4; *see also* Ex. B, C, E, F, H, and I; *accord* Compl. ¶¶ 84-85, 122-126. Mr. Choi also concedes that "***the POST request includes the name of an embedded video***." Choi Decl., ¶¶ 10, 14 (emphasis added). And the GET and Post requests confirm that people.com disclosed the Facebook ID of the individual that viewed the page in the c_user cookie. *See* Ex. B at 2, Ex. C at 2, Ex. E at 2, Ex. F at 2, Ex. H at 2, and Ex. I at 2 ("c_user:100083519931727"). Indeed, this c_user cookie confirms that it was not Mr. Choi, but his colleague, Aditya Chatterjee, who tested Defendants' webpage. Choi Decl. Ex. B at 2, Ex. C at 2, Ex. E at 2, Ex. F at 2, Ex. H at 2, and Ex. I at 2. As alleged in the complaint, anyone can figure out a person's identity by typing in the Facebook ID into one's web browser. Compl. ¶ 90. Visiting the webpage facebook.com/10008351993172 reveals Mr. Chatterjee's Facebook profile, including Mr. Chatterjee's name, and the first result in a Google search for "Aditya Chatterjee" is his LinkedIn page, revealing that he is Mr. Choi's colleague. As demonstrated by the Choi Declaration, Defendants' webpages disclosed to Facebook that Mr. Chatterjee requested or obtained specific videos.

### III.    LEGAL STANDARD ON A MOTION TO DISMISS

As this Court has made clear, to survive a motion to dismiss under Rule 12(b)(6), a complaint need only plead "sufficient factual content to allow a factfinder to draw the reasonable inference that the defendant is liable for the misconduct alleged." *United States ex rel. Daugherty v. Tiversa Holding Corp.*, 342 F. Supp. 3d 418, 425 (S.D.N.Y. 2018) (Cote, J.) (*citing Allen v. Credit Suisse Sec. (USA) LLC*, 895 F.3d 214, 222 (2d Cir. 2018)).  In ruling on a motion to dismiss, the Court "must accept as true all of the factual allegations set out in plaintiff's complaint, draw inferences from those allegations in the light most favorable to plaintiff, and construe the complaint liberally." *Roth v. Jennings*, 489 F.3d 499, 510 (2d Cir. 2007) (citation omitted).

It is improper to consider matters extrinsic to a complaint at the motion to dismiss stage. *Daugherty*, 342 F. Supp. 3d at 425, n.1; *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 154 (2d Cir. 2002) ("Once the District Court was presented with matters outside the pleadings, Rule 12(b) afforded two options.  The Court could have excluded the extrinsic documents.  Because it elected not to do so, however, the court was obligated to convert the motion to one for summary judgment and give the parties an opportunity to conduct appropriate discovery. . ."); *Nicosia v. Amazon.com Inc.*, 834 F.3d 220, 234 (2d Cir. 2016) (vacating dismissal of class action complaint pursuant to Rule 12(b)(6), in part due to the district court's erroneous reliance on "extrinsic materials" containing facts that "were neither alleged in nor integral to the complaint."). "Documents that are attached to the complaint or incorporated in it by reference… may be considered… on a Rule 12(b)(6) motion only to determine *what* the documents stated, and *not to prove the truth of their contents*." *Roth, supra*, 489 F.3d at 509 (2d Cir. 2007) (citation omitted) (emphases in *Roth*). "And whatever documents may properly be considered in connection with

the Rule 12(b)(6) motion, the bottom-line principle is that 'once a claim has been stated

adequately, it may be supported by showing any set of facts consistent with the allegations in the

complaint.'" *Id*. (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)).

Relatedly, if this Court determines that the arguments Defendants raise do not implicate

subject matter jurisdiction, *i.e.*, the court's constitutional power to hear the case, the motion

"must be analyzed under Rule 12(b)(6), not Rule 12(b)(1)." *Daugherty*, *supra*, 342 F. Supp. 3d

at 425; *accord Curtis v. Cenlar FSB*, No. 13-cv-3007 (DLC), 2013 WL 5995582, at *2 (S.D.N.Y.

Nov. 12, 2013) (holding that this Court will not "allow any Rule 12(b)(6) motion to be restyled as a

Rule 12(b)(1) standing motion."). The distinction between Rule 12(b)(6) and Rule 12(b)(1)

motions "is significant" because "a court may resolve factual disputes and consider extrinsic

evidence [of jurisdictional facts" when resolving a Rule 12(b)(1) motion, but may not do so

when resolving a Rule 12(b)(6) motion." *Daugherty*, 342 F. Supp. 3d at 425, n.1.

## IV. <u>PLAINTIFF HAS STANDING TO BRING SUIT</u>

The elements of Article III standing are (1) an "injury in fact" that is "concrete,"

"particularized" and "actual or imminent, not conjectural or hypothetical," (2) a causal

connection between the injury and the conduct of the defendant such that the injury is "fairly

traceable" to the defendant's conduct, and (3) that it is "likely. . . that the injury will be redressed

by a favorable decision." *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 55 (2d. Cir. 2016)

(*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992)). Defendants assert that Mr.

Martin failed to allege the first element, that he suffered an injury-in-fact. Mot. at 9. But Mr.

Martin has alleged disclosure of his private information, namely details of his private video

consumption. Compl. ¶¶ 3, 5, and 13. *Stanley v. Georgia*, 394 U.S. 557, 565 (1969) (holding

that the "possession… of filmed matter in… a person's own home" is private information).

Disclosure of private information is sufficiently concrete to qualify as an injury-in-fact.

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204.  ("Various intangible harms can also be

concrete.  Chief among them are injuries with a close relationship to harms traditionally

recognized as providing a basis for lawsuits in American courts. . . Those include. . . disclosure

of private information.").  Indeed, the Supreme Court in *TransUnion* found that individuals

whose private information was disclosed had Article III standing.  *Id.*  That is what Mr. Martin

has alleged.

 Conflating the relevant legal standards, Defendants argue that Mr. Martin lacks standing

because, they contend, Mr. Martin will lose on the merits of his VPPA claim.  Mot. at 11

(arguing that Defendants' disclosures "would not constitute a privacy injury under VPPA").

This is easily rejected.  Even if Defendants' argument had any merit, and it does not, Article III

standing is not the same thing as a VPPA "privacy injury."  Defendants' argument to the

contrary "improperly conflates the merits of Plaintiffs' claims with their standing to bring suit."

*In re Vizio Inc., Consumer Priv. Litig.*, 238 F. Supp. 3d 1204, 1216 (C.D. Cal. 2017) (denying

12(b)(1) motion to dismiss predicated on the exact same VPPA merits argument Defendants'

now raise).  As this Court has recognized, such "arguments are not properly characterized as

standing arguments.  All of the defendants' contentions concern the legal merits of [Mr.

Martin]'s complaint.  They reason that because [Mr. Martin] loses on the merits, he has not

suffered any 'cognizable injury… But this reasoning would allow any Rule 12(b)(6) motion to be

restyled as a Rule 12(b)(1) standing motion."  *Curtis*, *supra*, 2013 WL 5995582, at *2.

 Defendants attempt exactly that restyling to provide a fig leaf for their improper inclusion

of extrinsic evidence in their moving papers, including a declaration and multiple exhibits from

an unknown declarant nowhere referenced in the Complaint.  Defendants' attempt should be

rejected.  As an initial matter, on a fact-based Rule 12(b)(1) motion, a "district court [can] consider[] evidence outside the pleadings" *only if* such evidence places "jurisdictional facts in dispute." *Amidax Trading Grp. v. S.W.I.F.T. SCRL*, 671 F.3d 140, 145 (2d Cir. 2011).  Courts should disregard this evidence if it "goes not to standing but to the merits." *Carter*, 822 F.3d at 59; *accord Azeez v. Ramaiah*, No. 14-cv-5623 (PAE), 2015 WL 1637871, at *2 (S.D.N.Y. Apr. 9, 2015).  Moreover, because Defendants' arguments relate only to the merits of Mr. Martin's claims, and not to Article III standing, the task of the Court is to "analyz[e the motion] under Rule 12(b)(6)" and refrain from accepting Defendants' invitation to consider extrinsic facts or resolve factual disputes.  *Daugherty*, 342 F. Supp. 3d at 425, n.1.  Defendants' dim view of the factual merits of Plaintiffs' claims must be resolved in discovery.[7]

## V.    **DEFENDANTS' REMAINING ARGUMENTS FAIL**

### A.    **Mr. Martin Properly Alleges a Violation of the VPPA**

Mr. Martin alleges that Defendants knowingly programed their websites to capture information about videos accessed by their users and, without the consent of those users, transmits that information to Facebook along with a personally identifying Facebook ID number. Defendants counter that the information disclosed by Defendants does not include personally identifying information ("PII"); that Mr. Martin did not allege Defendants knowingly disclosed this information; that People.com is not a "video tape service provider" under the VPPA; and

---

[7] What is more, Mr. Choi's declaration is inconsequential and corroborates the Complaint's key allegations.  On a Rule 12(b)(1) motion, "plaintiffs are entitled to rely on the allegations in the Pleading if the evidence preferred by the defendant...does not contradict plausible allegations that are themselves sufficient to show standing."  *Carter*, 822 F.3d at 57.  As discussed in Section II.C.1, Mr. Choi confirms that both the names of the videos consumed on People.com, the URLs, and the Facebook ID are transmitted to Facebook.com.

that the video clips at issue are not "prerecorded video cassette tapes" or "similar audio visual materials" under the VPPA. These arguments are meritless.

### 1.    Defendants Disclosed Personally Identifiable Information

Personally identifiable information ("PII") under the VPPA is "information reasonably and foreseeably likely to reveal which [] videos [plaintiff] has obtained," *Yershov v. Gannett Satellite Info. Network, Inc.*, 820 F.3d 482, 486 (1st Cir. 2016), or which "'readily permits an ordinary person to identify a particular individual as having watched certain videos.'" *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 985-86 (9th Cir. 2017) (cleaned up) (*quoting In re Nickelodeon Consumer Privacy Litig.*, 827 F.3d 264, 267 (3rd Cir. 2016)). Mr. Martin's allegations that Dotdash Meredith disclosed his Facebook ID, the title of videos he accessed and the URLs at which those videos were located to Facebook through the Facebook Pixel, can state a claim under *either* standard.

### a.    Defendants Disclosed the Identity of Individuals

"The Facebook User ID is more than a unique, anonymous identifier. It personally identifies a Facebook user." *In re Hulu Priv. Litig.*, No. C 11-03764 LB, 2014 WL 1724344, at *14 (N.D. Cal. Apr. 28, 2014) ("*Hulu II*") (holding that the Facebook ID is sufficient identification under the VPPA). "A Facebook ID, as the *Hulu* court found, is thus equivalent to a name—it stands in for a specific person." *Robinson v. Disney Online*, 152 F. Supp. 3d 176, 184 (S.D.N.Y. 2015). "Simply put, in a socially networked world a Facebook ID is at least arguably 'akin' to an actual name that serves *without more* to identify an actual person." *In re Nickelodeon Consumer Priv. Litig.*, 2014 WL 3012873, at *12 (D.N.J. July 2, 2014) (emphasis added); *Ambrose v. Bos. Globe Media Partners LLC*, CV 21-10810-RGS, 2022 WL 4329373, at *1 (D. Mass. Sept. 19, 2022) (Facebook IDs sent via Facebook Pixel met the reasonably

13

foreseeable test); *Stark v. Patreon, Inc.*, No. 22-cv-03131-JCS, 2022 WL 7652166, at *8 (N.D. Cal. Oct. 13, 2022) (Facebook IDs sent via Facebook Pixel met the ordinary person test). Defendants do not cite a single case to the contrary.[8]

Instead, Defendants cite cases involving app IDs, Android IDs, Roku serial device numbers, and IP addresses to argue that an "anonymous string of numbers… is insufficient to qualify as personally identifiable information." Mot. at 20. But the Facebook ID at issue here is no *anonymous* "string of numbers." As explained by the Ninth Circuit, "Facebook assigns each user a unique Facebook User ID. The User ID is a string of numbers, but a user can modify the ID to be the user's actual name or invented screen name. Facebook considers the IDs to be personally identifiable information." *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1101 (9th Cir. 2014). The Facebook ID need not be "combined with other data" to allow an "ordinary person to identify a particular individual as having watched certain videos." *Eichenberger*, 876 F.3d at 985-86 (quotations omitted).

**b.     Defendants Disclosed Video Titles and URLs to Facebook**

Mr. Martin alleged that Dotdash Meredith's transmissions to Facebook through the Pixel provided enough information about the videos consumed to constitute PII, including video titles

---

[8] Defendants incorrectly claim that *Bernardino v. Barnes & Noble Booksellers, Inc.*, No. 17-CV-04570 (LAK) (KHP), 2017 WL 3727230, at *8 (S.D.N.Y. Aug. 11, 2017) holds that "'there is no binding precedent' holding that a Facebook cookie containing a 'Facebook ID' can constitute PII." Mot. at 20. But *Bernardino* did not concern Facebook IDs. *Bernardino* concerned an "fr" cookie which is a "string of letters and numbers" that did not contain a Facebook ID. 2017 WL 3727230, at *9, n.5 (S.D.N.Y. Aug. 11, 2017). The Facebook ID lies in the c_user cookie, **not** the fr cookie. *Austin-Spearman*, 98 F. Supp. 3d at 664 ("through its 'c _user' cookie, Facebook's code allegedly forces a user's web browser to look for the user's Facebook ID."); *In re Hulu Privacy Litig., 86 F. Supp. 3d 1090, 1102 (N.D.Cal. 2015 ("Hulu III")* ("the c_user cookie contained a user's Facebook ID."); *Ambrose*, 2022 WL 4329373, at *1 ("c :\user folder ('cookie')… contains that visitor's unencrypted Facebook ID."); *see also In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 927 (N.D. Cal. 2015) (detailed discussion of how the Facebook c_user cookie works).

and the URLs where those videos could be found.  Compl. ¶¶ 3, 5, 113-115, 120.  Either would be sufficient to state a claim; Dotdash Meredith disclosed both.

First, the title of a video can identify that video.  Dotdash Meredith argues that Mr. Martin has not alleged that it disclosed video titles to Facebook.  Mot. at 15-16.  But Mr. Martin alleged exactly that: "Every time a Registered User. . . views video content on People.com, Dotdash Meredith causes the identity of the viewer and the titles of the videos viewed to be shared with Facebook."  Compl. ¶ 3.  Mr. Martin further alleged that Dotdash Meredith's websites "include code, called the Facebook Pixel, which tracks and records viewers' behavior on the website, including behavior related to video consumption. . . this code collects video-watching history and discloses it to Facebook, and ties that information directly to the real-world identity of the viewer by disclosing the viewer's unique Facebook ID in conjunction with the title of each video the viewer watches."  Compl. ¶ 5.[9]

Second, Mr. Martin alleged that Defendants provided the URLs associated with the videos.  All that is required is an allegation that Dotdash Meredith's disclosures provide enough information to identify which video Mr. Martin accessed.  For instance, transmission of a "short string of numbers that links to a particular video name" is enough to make out a claim under the VPPA because the recipient "can identify which users watch which videos" using the data transmitted.  *Louth v. NFL Enterprises LLC*, No. 1:21-cv-00405-MSM-PAS, 2022 WL 4130866 (D.R.I.); *Cappello v. Walmart, Inc*., No. 18-cv-06678-RS, 2019 WL 11687705, at *1 (N.D. Cal.

---

[9] The court must "accept[ ] all factual allegations as true and draw[ ] all reasonable inferences in favor of the plaintiff."  *Empire Merchants, LLC v. Reliable Churchill LLLP*, 902 F.3d 132, 139 (2d Cir. 2018). Mr. Martin's allegations are more than "threadbare recitals of the elements of a cause of action" and are entitled to presumption of truth.  *Id*.  Moreover, Dotdash Meredith's expert, Mr. Choi, proves up this allegation.  As discussed above, n.6, according to Mr. Choi, ***the Facebook Pixel transmits the titles of videos requested or obtained*** by registered users to Facebook via POST requests.  Choi, Decl., ¶¶ 4, 10.

Apr. 5, 2019) (Walmart's disclosure of the product IDs of purchased video media to Facebook sufficient to constitute PII). A URL that links to the video is no different from a short string of numbers; both can easily be used to identify the video in question. Transmission of a video name or URL, along with a corresponding Facebook ID, is "reasonably and foreseeably likely to reveal which. . . videos. . . the plaintiff has obtained," *Louth*, 2022 WL 4130866, at *3 (citing *Yershov*, 820 F.3d at 486), and is therefore sufficient to state a claim under the VPPA. This data is sufficient for ordinary individuals to determine the videos obtained by an individual. *Eichenberger*, 876 F.3d at 985-86.[10]

Defendants attempt to argue that the Facebook Pixel does not disclose video titles on the basis that Facebook's marketing materials about the Pixel state that the Pixel, under its default settings, does not share information about what users "see or do" on webpages they access; in making this argument Defendants request judicial notice or incorporation by reference of those marketing materials. Mot. at. 6 and n.8, n.9. Defendants' argument is improper because it asks the Court to assume the truth of those marketing materials. "Documents that are attached to the complaint or incorporated in it by reference… may be considered…on a Rule 12(b)(6) motion 'only to determine *what* the documents stated,' and '*not to prove the truth of their contents*.'" *Roth*, *supra*, 489 F.3d at 509 (2d Cir. 2007).

Indeed, Defendants' counsel were instructed on this point last year. *Cottle v. Plaid Inc.*, 536 F. Supp. 3d 461, 476–77 (N.D. Cal. 2021) (refusing to consider five exhibits submitted by

---

[10] Defendants cite *FTC v. Amazon.com, Inc.*, for the proposition that "mere navigation to articles. . . reveals nothing about the user's video-viewing history." No. C14-1038-JCC, 2015 WL 11256312 (W.D. Wash. 2015). That Defendants are wrong—certainly some information about the user's video-viewing history can be determined by disclosing the URLs at which they viewed videos—is beside the point. As alleged by Mr. Martin, and confirmed by the Choi declaration, Defendants did not merely disclose information about the webpages that their users navigated to, but also the titles of the videos hosted on those webpages.

Defendants' counsel in support of a motion to dismiss because "it is improper to assume the truth of an incorporated document if such assumptions only serve to dispute facts stated in a well-pleaded complaint. . . [T]he unscrupulous use of extrinsic documents to resolve competing theories against the complaint risks premature dismissals of plausible claims that may turn out to be valid after discovery.").

c.    **Mr. Martin "Requested or Obtained" Videos By Visiting the Pages Hosting Them**

Mr. Martin's navigation to the webpage containing a particular video (Compl. ¶ 13, 82) constitutes 'obtaining or requesting' that video. By navigating to a particular page with a particular video, Mr. Martin has requested that video. Dotdash Meredith then shows Mr. Martin that video; when he receives the video from Dotdash Meredith, he obtains it. Dotdash Meredith then sends Facebook information about Mr. Martin and the video he requested and obtained.[11]

In response, Defendants conflate the statutory requirement that Mr. Martin 'obtained or requested' a video with whether Plaintiff watched a video. Mot. at 18 ("an article webpage's URL does not reveal whether a People.com user *watched* or obtained any video, let alone a particular video"); Mot. at 17 ("there is no allegation (and there could be none) that information about whether a user actually viewed the video is ever transmitted."). The VPPA does not concern itself with whether an individual actually watched a video. It is irrelevant whether Mr.

---

[11] Defendants argue that "[w]hether Plaintiff (or any other putative class member) 'requested or obtained' a video after navigating to a particular webpage is utter conjecture." But navigating to the webpage that contains the video is the act that constitutes 'requesting or obtaining' that video. People.com and PeopleTV.com use thumbnails to display various content to their users; the thumbnails that link to videos show a title and a play button, indicating that there is a video at the end of that link. By clicking on that thumbnail, Mr. Martin is requesting that video. When Defendants' website directs him to that video, he has obtained it.

Martin actually watched the videos he requested or obtained, just as it is immaterial (and nigh on impossible to prove) whether Robert Bork watched the videos he rented.

Defendants also argue that Mr. Martin failed to allege that Defendants provided information to Facebook about whether Plaintiff "interacted with" the video by pressing play or rewind, or skipping to a particular section, and that therefore Plaintiff failed to state a claim under the VPPA. But they offer no support for this requirement, and indeed there is none. Under Defendants' construction of the VPPA, Robert Bork could not pursue a claim because he requested or obtained certain videos and that the video company disclosed those videos. Instead, he would have to show that the video company disclosed that he *actually watched* each of those 147 videos, and would have to prove that the video company in fact *knew* whether he watched those videos. The VPPA plainly does not require this; disclosure of Mr. Martin's identity and the videos he requested or obtained make out a claim.

## 2. Defendants Knowingly Transmitted Personally Identifiable Information

The Facebook Pixel is designed to track the activities of users of a website and report that information to Facebook, along with a Facebook ID, *so that Facebook can track the activities of website users and associate those activities with Facebook accounts*. The purpose of this tracking, as described by Facebook, is to "match your website visitors to their respective Facebook User accounts. . . [and] tally their actions. . . so you can use the data to analyze your website. . ." Compl. ¶¶ 97-100. Facebook's marketing of the Pixel creates a reasonable inference that Defendants knowingly transmitted PII to Facebook. *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3 (noting marketing efforts of a similar product created an inference of knowing transmission of PII). Plaintiff further alleged that Meredith Corporation (before the merger), installed the Facebook Pixel and intentionally configured it to track videos

requested or obtained by users, knowing that this data would be sent to Facebook.  Compl. ¶¶ 114-116.  These allegations are enough to state a claim under the VPPA.

Defendants rely on *Hulu III* for the proposition that Plaintiff must allege that Defendants knew that Facebook was "pairing this information."  Mot. at 22 (*citing* 86 F. Supp. 3d at 1095) and asserts that Plaintiff failed to do so.  Mr. Martin did so: he plainly alleged that Defendants knew that Facebook was "pairing this information."  For instance, Mr. Martin alleges that Defendants would have been made aware that Facebook uses the PII data it receives from People.com through Facebook's marketing materials of the Pixel.  "The Facebook Pixel. . . relies on Facebook cookies *which enable us to match your website visitors to their respective Facebook User accounts.*"  Compl. ¶ 99 (emphasis added).  Once the Pixel is "triggered and reports [an] action," Defendants "will be able to reach this customer again by using a custom audience" and Facebook will "get[] better at delivering your ads to people who are more likely to take certain actions."  Compl. ¶ 131.  These materials show that the purpose and benefit of using the Facebook Pixel is in matching user identity to the content that user accessed.  "Given the facts alleged, it can be reasonably inferred that [defendant] knowingly transmits PII for the purpose of target advertising.  Furthermore, it cannot be said that upon discovery such a linkage is not too dependent on too much yet-to-be done or unforeseeable detective work."  *Louth v. NFL Enterprises LLC*, 2022 WL 4130866, at *3.

Defendants' knowing disclosure argument is premised almost entirely on *Hulu III*.  This case has no application to this motion, as the court in *Hulu II* denied a summary judgment motion on the knowing disclosure element because the "court cannot dispose of a case involving fact questions about knowledge on an undeveloped record."  *See Hulu II*, 2014 WL 1724344, at *17.  The knowledge element involves review of, among other things, "[e]mails about cookie

placement" and other "documents and source code." *Id.* at *16-*17.  Mr. Martin has alleged that

Defendants knowingly transmitted this data to Facebook; to conclude that Defendants did not

know it disclosed this information before allowing Mr. Martin to take discovery would be

improper.[12]

### 3.     Defendants and People.com Are Video Tape Service Providers

Defendants business model is to create and post video content on websites like

People.com and PeopleTV.com.[13]  "The statute defines a video tape service provider as anyone

"engaged in the business ... of rental, sale, *or delivery* of prerecorded video cassette tapes or

similar audio visual materials."  *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F.

Supp. 3d 767, 799 (N.D. Cal. 2019) (emphasis in original).  Websites that "maintain [] a cache of

videos and visual materials" among other forms of written media, like facebook.com, have still

been held to be "video tape service providers" under the VPPA.  *Id.* at 798-99 (denying motion

to dismiss).  Indeed, "a defendant can be 'engaged in the business' of delivering video content"

under the VPPA when it is "substantially involved in the conveyance of video content."  *In re*

*Vizio*, 238 F. Supp. 3d at 1221 (denying motion to dismiss and holding that a television capable

---

[12] Defendants also cite *Bernardino*, 2017 WL 3727230, at *9, a case arising in the context of a request for a preliminary injunction.  In that case, the court found "it is an open question as to whether Bernardino will prevail on the knowledge element of her VPPA claim" and therefore, under the standard of "substantial showing of success on the merits and a strong showing of irreparable harm," Plaintiff failed to meet their burden, *Bernardino,* 2017 WL 3727230, at *4.  Even if the facts here were analogous to the facts in *Bernardino*, as defendants suggest, it is still 'an open question' whether Mr. Martin can show knowledge.  Where there is an open factual issue, deference must be given to the Plaintiff's allegations.  In other words, Mr. Martin's claims are subject to a different, much lower, standard than that at issue in *Bernardino*.  Under this lower standard, his claims should not be dismissed.

[13] Defendants do not contest that PeopleTV.com is a video tape service provider.  PeopleTV.com is a video tape service provider as it contains only videos and is the quintessential online video streaming service Congress sought to regulate when passing the 2012 VPPA amendment.

of internet access was a video tape service provider under VPPA).  Defendants and People.com
meet this low bar.

In fact, Meredith Corporation often emphasizes to its shareholders in various SEC filings,
earnings call transcripts, and press releases about how it is "substantially involved in the
conveyance of video content."  *See* Compl. ¶¶ 35-51, n. 5-28.  Last year, Meredith Corporation
told its investors it "recorded 5 billion video views on its platforms" and that it was only just
getting started: "As part of our strategy, we will accelerate investment in growing platforms such
as … video to serve audience *wherever* they choose to consume our content."  *Id*. ¶¶ 35 and 48
(*quoting* 2021 Annual Report and Transcript of June 2021 Investor Update) (emphasis added).
Dotdash Meredith also says it is "very interested in developing a long-form video strategy; one
which really focuses on the lifetime value of the video library."  *Id*. ¶ 50. Dotdash Meredith's
People.com Media Kit, used to sell ads to ad-buyers, emphasizes video content on People.com.
*Id*. ¶ 58.

People.com is also a video tape service provider.  "Video content is a major focus of
People.com."  *Id*. ¶ 55.  "People.com has over 29 million video views every month" and "runs
YouTube, TikTok, Twitter, Pinterest, and Instagram accounts where it promotes its videos."  *Id*.
¶¶ 57-59.  People.com maintains its own cache of videos it provides to users, along with linking
to the videos hosted on PeopleTV.com on the front page of People.com on the top header.[14]  *Id*. ¶
65 (Screenshot reproduced below):



---

[14] *See, e.g.,* https://people.com/pets/christy-carlson-romano-helps-couple-adopt-dog-celebrity-pet-matchmaker/ or
https://people.com/crime/human-remains-found-brian-laundrie-search-florida-park/.

The videos on People.com (and PeopleTV.com) are the main focus of the webpages; they appear at the top of the webpage, begin playing immediately, and continue to play and follow the user as she scrolls down the webpage.  And links to People.com webpages containing videos feature a triangular play button showing that the linked-to webpage features a video.

Defendants argue that much of their websites contain written articles, not videos.  But the same could be said for Facebook, which mainly contains news articles, written posts, comments, and photos, along with videos.  Nevertheless, Facebook is a video tape service provider under the VPPA.  *In re Facebook, Inc., Consumer Priv. User Profile Litig.*, 402 F. Supp. 3d at 799. Likewise, the Boston Globe, a storied newspaper, has been found to be a video tape service provider.  *Ambrose v. Boston Globe Media Partners LLC*, 2022 WL 4329373 ("Congress passed the VPPA 'after the *Washington City Paper* published Supreme Court nominee Robert Bork's video rental history.").  And back in 2010, when it was still mainly known as an online book retailer, "Amazon qualifie[d] as a 'video tape service provider."  *Amazon.com LLC v. Lay*, 758 F. Supp. 2d 1154, 1170 (W.D. Wash. 2010).  Indeed, "many video tape service providers also offer numerous goods and services unrelated to audio video services or audio video materials." *United States v. Shultz*, No. 16-10107-01-EFM, 2018 WL 534333, at *3, n.14 (D. Kan. Jan. 24, 2018).[15]

Defendants next argue that the video "clips" on People.com are not "similar audio visual materials," worthy of protection under the VPPA, because Defendants' view is that the VPPA covers movies and not other types of pre-recorded videos.  Mot. at 26.  If Congress only intended

---

[15] Defendants also repeatedly claim that People.com is a "free website."  Mot. at 1, 2, 24.  Setting aside that this is not true—because the price Plaintiff pays is the *loss of control* over his private information*, In re Facebook Priv. Litig.*, 572 F. App'x 494 (9th Cir. 2014) (recognizing there is a "sales value [to] that information")—it is also irrelevant to Defendants' VPPA arguments.  *Yershov*, 820 F.3d at 488 ("we… decline to interpret the statute as incorporating monetary payment as a necessary element.")

to protect full-length feature films, it could have passed the "Full-Length Feature Film Privacy Protection Act." But it did not. "[T]he Senate Report's discussion of "similar audio visual materials'… suggests Congress's intent to cover new technologies for ***pre-recorded video content***. Indeed, the Senate Report discusses extensively the concept of privacy in an evolving technological world." *In re Hulu Privacy Litigation*, 2012 WL 3282960, at *6 (N.D. Cal. Aug. 10, 2012) ("*Hulu I*") (emphasis added). Relying on *Hulu I*, the *Louth* court held that the NFL was a VTSP because it streamed to fans short "video clips…including prerecorded game highlights and other videos." 2022 WL 4130866, at *4; *cf. In re TikTok, Inc., Consumer Priv. Litig.*, 565 F. Supp. 3d 1076, 1079 (N.D. Ill. 2021) (approving $92 million settlement of, *inter alia*, VPPA claims against a company disclosing app users' consumption of "relatively short homemade videos" without consent).[16] And Defendants host a wide panoply of "pre-recorded video content," from clips imbedded on People.com articles to several shows on PeopleTV.com, including *several hour-long* episodes of *PEOPLE Presents*: *Royals Specials*[17], and 10-minute-long episodes of *Celebrity Pet Matchmaker*.[18] The Boston Globe website, which likewise contains video clips and has no feature length films, was sufficient for the VPPA. *Ambrose*, 2022 WL 4329373.

What is more, consistent with the Congress's purpose, the term "audio-visual material" is appropriately quite broad. While the VPPA leaves the term undefined, the Copyright Act defines

---

[16] And when the VPPA was amended in 2012, Senator Al Franken stated: "Streaming is the future of video… I think it is clear that the law does cover new technologies like streaming because it does not just cover 'prerecorded video cassette tapes' it also covers 'similar audio-visual materials.'" 131 Harv. L. Rev. 1766, 1789, n.30 (2018) (*quoting The Video Privacy Protection Act: Protecting Viewer Privacy in the 21st Century, Hearing Before the Subcomm. on Privacy, Tech. & the Law of the S. Comm. on the Judiciary,* 112th Cong. 3 (2012)).

[17] https://peopletv.com/all-shows/royals/

[18] https://peopletv.com/all-shows/celebrity-pet-matchmaker/

an "audiovisual work" as any work which consists "of a series of related images which are

intrinsically intended to be shown by the use of machines or devices such as projectors, viewers,

or electronic equipment, together with accompanying sounds."  17 U.S.C. § 101.  This term has

been held to cover video games, *Atari Games Corp. v. Oman*, 888 F.2d 878, 882 (D.C. Cir.

1989) (Ginsburg, J.), karaoke devices, and even PowerPoint presentations.  *Leadsinger, Inc. v.

BMG Music Pub.*, 512 F.3d 522, 528 (9th Cir. 2008) (*citing* 1 Nimmer on Copyright § 2.09[B]).

Viewed in this larger context, the "pre-recorded video content" posted on People.com and

PeopleTV.com is "similar" enough to cassette tapes to qualify for VPPA protection.

## B.    Defendants' Rule 8(a) Arguments Fail

Contrary to Defendants' assertion, Mr. Martin gave them "fair notice" of his secondary

state law counts under Rule 8(a) in his 181-paragraph, 44-page complaint.  Those counts

explicitly "reallege[] and reincorporate" the primary VPPA count and "all preceding

paragraphs."  Compl. ¶¶ 162, 167, 171, and 175.  This Court has rejected similar arguments

before, recognizing "that the incorporation of preceding paragraphs into subsequent causes of

action is a standard practice, specifically permitted by Rule 10(c)."  *Iconix Brand Grp., Inc. v.

Bongo Apparel, Inc.*, No. 06-cv-8195 (DLC), 2008 WL 2695090, at *3 (S.D.N.Y. July 8, 2008).

All that is required at this early stage of litigation is a "short and plain statement of the claim

showing that the pleader is entitled to relief."  *Id*.  (*quoting* Fed. R. Civ. P. 8(a)(2)).

Defendants first argue that the secondary state law counts "impermissibly lump together

the Defendants."  Mot. at 28.  Yet they did not raise a similar objection to the primary VPPA

claim.  And Mr. Martin's Cal. § 1799.3 claim (Count 2), California Unfair Competition Law

(Count 4), and New York General Business Law (Count 5) claims are all based on the same

predicate VPPA violation—the disclosure of personally identifiable information related to video

consumption on People.com and Peopletv.com through the Facebook Pixel.  Compl. ¶¶ 164, 173, 179.  What is more, the Complaint's preceding paragraphs explain the Defendants' different roles.  Dotdash Meredith "owns and continues to operate the business units relevant to this class action" and was created as a separate business entity after a recent merger between Defendants IAC, Meredith Corporation, and Meredith Holdings Corporation.  *Id*. ¶¶ 20, 21, 31; *see also id*. ¶¶ 14-19.  Before this merger, Meredith Corporation and Meredith Holdings Corporation maintained "39 different websites and applications," including People.com, *id*. ¶¶ 39, 53 (*citing* Meredith Corporation's June 30, 2021 Form 10-K filing and 2019 Quarter 4 Earnings Call Transcript, respectively), and that after the merger, Dotdash Meredith took over ownership and operation of People.com and PeopleTV.com, *id*. ¶¶ 21, 52, 61.

Defendants also complain that Counts 2-5 use the words "websites" and "commercial websites," instead of People.com.  Mot. at 28-29.  Yet as another Court explained to Defendants' same counsel, "commercial website" is a term of art used in the California OPPA (Count 3). *Cappello v. Walmart Inc*., 394 F. Supp. 3d 1015, 1023 (N.D. Cal. 2019) (the OPPA prohibits a "commercial website operator from 'knowingly and willfully' or 'negligently and materially' failing to comply with the provisions of its posted privacy policy.")  And the use of the *plural* websites signifies that more than one People.com and PeopleTV.com website contains a video. Fairly read, the Complaint does not seek to impose liability on Defendants for their operation of websites beyond the People.com and PeopleTV.com domains.  Defendants' argument that Counts 2-5 should be dismissed for using the words "commercial websites" or "websites," Mot. at 29, is borderline "frivolous."  *Iconix Brand Grp.*, 2008 WL 2695090, at *3.

**C.    Mr. Martin Has Properly Pled New York And California State Claims**

**1.    Mr. Martin Pled a Violation of California Civil Code § 1799.3**

Mr. Martin adequately pled a claim under California Civil Code § 1799.3, which prohibits "video recording sales or rental service" providers from disclosing any personal information or the contents of any record, including sales or rental information to any person other than the individual who is the subject of the record, without the written consent of that individual. Cal. § 1799.3(a). Only "willful" violations can result in civil penalties. *Id.* § 1799.3(c). Defendant asserts various arguments that Mr. Martin failed to adequately plead this claim; each is lacking.

*First*, Defendants argue that they do not provide video recording sales or rental services under § 1799.3 because they provide videos for "free." Mot. at 30. Not so. A substantial proportion of Defendants' business is in streaming video content to their users and showing those users ads to generate a profit. Compl. ¶¶ 43, 47. *Second*, Defendants argue that "the statute covers only an entity offering video recordings for an exchange of value. . ." Mot. at 30. Defendants receive value by showing their users advertisements—users' time and attention is valuable, and Defendants are in fact paid for it. Compl. ¶¶ 43, 47; *see also In re Facebook Priv. Litig.*, 572 F. App'x 494 (9th Cir. 2014) (recognizing there is a "sales value [to] that information" which serves as damages for a breach of contract and fraud claims). And even were that not so, Section 1799.3, like the VPPA, is concerned with protecting the privacy rights of Defendants' users over their personal information, not with whether Defendant, while violating those privacy rights, is generating profits from subscriptions, ads, or rental fees. Defendants' only support for this argument comes from *In re Certified Question from United States Ct. of Appeals for Ninth Cir. (Deacon v. Pandora Media, Inc.)*, 499 Mich. 477, 488

(2016), which Defendants fundamentally misunderstand.  This decision arose under a Michigan law, the PPPA, that provides a cause of action for "customers."  The decision was, however, explicitly "limit[ed] [to] the question. . . whether plaintiff can be characterized under the PPPA as a 'customer'" and "need not address whether plaintiff established the remaining elements of a PPPA claim, such as, for example, whether the PPPA applied to defendant because it was 'engaged in the business of renting or lending. . . sound recordings."  *Id.* at 491.[19]

*Third*, Defendants argue that they did not "information about videos a person bought or rented."  Mot. At 30.  Defendants provide no support for this argument.  Section 1799.3, however, explicitly protects against disclosure of "*any* personal information, or the contents of *any* record, *including* sales or rental information. . ."  Personal information, in short, includes the identity of a user and the videos they have requested or obtained.  Indeed, "personal information" is broader even than the "personal identifying information" covered by the VPPA.  As discussed in Section VI.A-B, Defendants have disclosed personal information under the VPPA, and have thus met the requirement under Cal. § 1799.3.

*Fourth*, Defendants argue that their violation of  Cal. § 1799.3 was not willful and is thus not subject to a civil penalty under Cal. § 1799.3(c).  "Willfulness encompasses not only actual knowledge but also recklessness."  *Mollett v. Netflix, Inc*., No. 5:11–CV–01629–EJD, 2012 WL 3731542, at *4 (N.D. Cal. Aug. 17, 2012), *aff'd*, 795 F.3d 1062 (9th Cir. 2015) (*citing Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 57-58 (2007)).  Plaintiff alleged that Defendants willfully

---

[19] Indeed, the fact that the decision distinguishes between whether users of the service are 'customers' and whether the content provider provided rental services is strong support for the proposition that a company can engage in video rental services without directly invoicing its users.  Section 1799.3 is notably different from the Michigan statute in that it does not provide a right of action only to customers.  Rather, it provides that a civil action may be brought by a "person who is the subject of the records."  Cal. Civ. Code § 1799.3(c).  Mr. Martin is such a person.

disclosed personal information by intentionally installing the Facebook Pixel and configuring its settings to track, capture and transmit video watch history to Facebook.  Compl. ¶¶ 114-116.

### 2. Mr. Martin Properly Pled that Defendants Knowingly and Willfully Violated the OPPA

Defendants argue that the OPPA does not include a right of private action.  Mot. at 31.[20] "There are times when a private right of action may be *implied* by a statute." *Mabry v. Superior Ct.*, 185 Cal. App. 4th 208, 218 (2010).  California courts look to "the presence of a *comprehensive administrative* means of enforcement," to determine whether there is a private right of action.  *Id.* (emphasis in original) (*citing Moradi-Shalal v. Fireman's Fund Ins. Companies*, 46 Cal. 3d 287, 300 (1988)).

"First, California courts, quite naturally, do not favor constructions of statutes that render them advisory only, or a dead letter." *Id*.  "Second, statutes… should be construed together so that all the parts of the statutory scheme are given effect [with reference to the] enforcement mechanism available at hand to enforce [those provisions]." *Id*. at 219.  "Third, historical context… [and] [f]inally, of course, there is recourse to legislative history." *Id*.  These factors support an implied private right of action to the OPPA.  In the lead-up to the OPPA's passage in 2003, the lack of administrative enforcement over online privacy policy and the need for "meaningful and accessible enforcement under California law" to help promote public confidence in the internet were cited by bill's author as reasons for the OPPA's passage. California Bill Analysis, A.B. 68 Sen., 7/03/2003 (available on Westlaw) ("Many consumers

---

[20] Defendants cite two cases for this proposition: *People ex rel. Harris v. Delta Air Lines, Inc.*, 247 Cal. App. 4th 884 (2016) and *In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318 (N.D. Cal. Aug 30, 2017).  These cases only address this issue in passing.  *Delta* stated that the OPPA does not "*explicitly* provide for a private action."  247 Cal. App. 4th at 900, n.12 (emphasis added).  *Yahoo!* cited *Delta* and noted that the issue was uncontested.  2017 WL 3727318, at *44.  Whether there is an *implied* private right of action under the OPPA was not analyzed in these cases.

refuse to do business online because they have little protection against abuse. The bill provides meaningful privacy protections that will help foster the continued growth of the internet economy… The only sure method of recourse is to literally make a federal case of the matter by filing a complaint with the Federal Trade Commission (FTC). This bill provides for meaningful and accessible enforcement under California law.").[21] The author's reference to "accessible enforcement" clearly implies a private right of action by aggrieved Consumers.

This legislative intent is also evinced by the OPPA's language, which provides that "knowing[] and willful[]" or "negligent[] and material[]" failure to conform to the statute's provisions constitutes a "violation." Cal. Bus. & Prof. Code § 22576. This language suggests that the Legislature sought to create a statute with teeth, not one that would render the word "violation" meaningless. Further, by including a standard of proof, the legislature intended to create a cause of action. This is also evinced by § 22578 which provides that "[i]t is the intent of the Legislature that this chapter is a matter of statewide concern" that preempts all other municipal laws. Cal. Bus. & Prof. Code § 22578.

### 3.    Mr. Martin Properly Pled a Violation of the UCL

Mr. Martin has pled a violation of California's Unfair Competition Law, which proscribes "unfair competition" defined as "any unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. Each of the three UCL prongs provides a "separate and distinct theory of liability" and an independent basis for relief. *Rubio v. Capital One Bank*,

---

[21]https://1.next.westlaw.com/Document/I389144203CE211D9917BC999AA77E1B1/View/FullText.html?navigationPath=%2FRelatedInfo%2Fv1%2FkcLegislativeMaterials%2Fnav%3FdocGuid%3DN67CA158082B811D8BE40B2081C49D94B%26midlineIndex%3D15%26warningFlag%3Dnull%26planIcons%3Dnull%26skipOutOfPlan%3Dnull%26sort%3Ddefault%26category%3DlegislativeMaterials&listSource=RelatedInfo&list=LegistiveMaterials&rank=15&ppcid=dccfe8fdcbe34a15af3b1a2e7238c03e&originationContext=legislativeMaterials&transitionType=ReportsRelatedItem&contextData=%28sc.UserEnteredCitation%29.

613 F.3d 1195, 1203 (9th Cir. 2010). Mr. Martin's allegation is properly pled under the unlawful and unfair prongs.

Defendants argue that Mr. Martin has failed to allege a UCL claim and rely chiefly on *Cappello v. Walmart Inc.*, 2019 WL 11687705, which dismissed a UCL claim predicated only on violations of the VPPA and Cal. § 1799.3. Not so. Indeed, in *Cappello*, following the April 2019 dismissal of Plaintiff's UCL claim cited by Defendants in this case, Plaintiff amended their complaint to assert a UCL claim based on the OPPA violation; Walmart's subsequent motion to dismiss the revised UCL claim was denied.[22]

Mr. Martin's allegations also adequately pled a violation under the 'unfair' prong of the UCL. In determining an unfair practice, "[s]ome California courts apply a balancing test, which requires courts to 'weigh the utility of the defendant's conduct against the gravity of the harm to the alleged victim.'" *Cappello*, 394 F. Supp. 3d at 1023. "Under the balancing test, the California Courts of Appeal have stated that 'an unfair business practice occurs when it offends an established public policy or when the practice is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.'" *Id.* at 1023-24 *(quoting Bardin v. DaimlerChrysler Corp.*, 136 Cal. App. 4th 1255 (2006)). California has a "well established public policy of protecting consumer data, as reflected in Section 22576 and other statutes." *Id.* "District courts

---

[22] *Cappello v. Walmart Inc.*, 394 F. Supp. 3d 1015 ("Plaintiffs aver that Walmart's breach of its Privacy Policy constituted a violation of Section 22576 [of the OPPA], which prohibits a commercial website operator from 'knowingly and willfully' or 'negligently and materially' failing to comply with the provisions of its posted privacy policy. By alleging that Walmart shared Plaintiffs' and class members' video media purchase information with Facebook for direct marketing, Plaintiffs adequately pled a violation of Section 22576, which is sufficient to state a UCL claim under the unlawful prong."); *see also In re Yahoo! Inc. Customer Data Sec. Breach Litig.*, No. 16-MD-02752-LHK, 2017 WL 3727318, at *23 (N.D. Cal. Aug 30, 2017). The same is true here.

have found similar allegations sufficient to plead 'unfair' conduct under the balancing test." *Id.* (collecting cases); *see also In re Yahoo!*, 2017 WL 3727318, at \*24.

Under the tethering test, applied by other California courts, the same result obtains: "Plaintiffs' unfair-prong claim is tethered to the United States' and California's policy for protecting the privacy of video media purchasers." *Id.* (*citing* VPPA, 18 U.S.C. § 2710; Cal. § 1799.3). "More broadly, the claim aligns with California's policy of protecting customer data generally and holding companies accountable to their own privacy policies, as reflected in Section 22576." *Id.* These policies were sufficient to support a claim in *Cappello*, and they suffice here as well.

### 4.  Defendants' N.Y. General Business Law Arguments Fail

GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business trade or commerce in the furnishing of any service in [New York]." A GBL § 349 claim requires (1) that a defendant engaged in consumer oriented conduct; (2) that it is materially misleading and (3) that the plaintiff has suffered an injury as a result of this conduct. In response, Defendant first argues that Mr. Martin fails the notice pleading standard by merely referring to the "acts and conduct of defendants." Count 5 of the complaint, however, includes all allegations previously made throughout the complaint. Compl. ¶ 175. Further, Mr. Martin does not merely refer to the acts and conduct of Defendants, but to the acts and conduct "alleged above and herein." *Id.* ¶ 177. Mr. Martin is referring to the scheme by Defendants to install and configure the Facebook Pixel to capture video viewing information, and other information about users and transmit that information, along with their Facebook ID, to Facebook. *See, e.g.*, Compl. ¶¶ 82-86. Those actions constitute "deceptive acts and practices" under § 349.

Second, Defendants argue that Mr. Martin has failed to allege a cognizable injury under § 349; not so. The cognizable injury at issue under § 349 is the same cognizable injury that Congress, the California Legislature, and the New York Legislature sought to protect against by passing the VPPA, the OPPA, and New York's VCPA (GBL § 672). The key case on this issue is *Mount v. Pulsepoint, Inc*, 684 F. App'x 32 (2d Cir. 2017) *as amended* (May 3, 2017). There, the district judge found, and the Second Circuit confirmed, that plaintiffs suffered no cognizable injury where a company "collect[ed] internet users' *aggregated, anonymized web-browsing data*." *Id.* at 35 (emphasis added). The Second Circuited noted that "absent any allegations that the data collected would or could be associated with individual users (or some other alleged factual basis for a cognizable privacy injury) there is no basis in New York law to recognize a cognizable injury under § 349." *Id.* Even so, where a claim under § 349 "contain[s] non-conclusory allegations that defendants collected and used personal data that is 'identifiable or associable with specific individual[s]'" the requirement for actual harm is met. *McDonald v. Kiloo ApS*, 385 F. Supp. 3d 1022, 1038 (N.D. Cal. 2019) (finding app that collected data associated with and used to track and profile individual children users met the standard for actual harm under § 349). In this case, the data collected could be (and is) associated with individual users. Compl. ¶82-86. Defendants transmit the users' Facebook ID along with the webpages and videos they have viewed on Defendants' websites to Facebook. *Id.*

Defendant's third argument is that Mr. Martin fails to allege a sufficient nexus with New York, despite Mr. Martin's allegations that Defendants and their website are based in New York, and communications with that website are "equivalent to communicating or transacting directly with a New York address." *Ward v. TheLadders.com, Inc.*, 3 F. Supp. 3d, 151, 168 (S.D.N.Y. 2014). Allegations of deceptive acts on a New York website do more than "hatch[] a scheme or

originat[e] a marketing campaign in New York." *Id.* In this circumstance, out of state plaintiffs "give rise to a plausible inference that the allegedly deceptive transaction occurred in New York and that the defendant's conduct fell within the ambit of the 'legislative intent to address commercial misconduct occurring within New York.'" *Id.* (*quoting Goshen v. Mut. Life Ins. Co. of N.Y.*, 98 N.Y.2d 314 (2002)).

## VI.  **CONCLUSION**

For the foregoing reasons, Defendants' Motion to Dismiss should be denied.

Dated:  October 28, 2022                    Respectfully submitted,

ELLIS GEORGE CIPOLLONE
O'BRIEN ANNAGUEY LLP


By:    s/Eric M. George
_____
        Eric M. George
        Carl A. Roth (*pro hac vice* forthcoming)
        Ryan Q. Keech (*pro hac vice* forthcoming)
        Stefan Bogdanovich (admitted *pro hac vice*)
2121 Avenue of the Stars, 30th Floor
Los Angeles, California 90067
Telephone: (310) 274-7100
egeorge@egcfirm.com
croth@egcfirm.com
rkeech@egcifrm.com
bogdanovich@egcfirm.com
*Attorneys for Plaintiff, William J. Martin*